Girardeau A. SPANN, et al., Appellants,

v.

COLONIAL VILLAGE, INC., et al.

Girardeau A. SPANN, et al., Appellants,

v.

Marvin J. GERSTIN, et al.

Nos. 88–7257, 88–7260.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 30, 1990.
Decided March 13, 1990.

Niki Kuckes, with whom William H. Jeffress, Jr., David G. Webbert, Washington, D.C., and Kerry Alan Scanlon were on the brief, for appellants.

Reuben B. Robertson, Washington, D.C., for appellees, Colonial Village, Inc. and Mobil Land Development Corp. in No. 88–7257.

Peter L. Sissman, Arlington, Va., for appellees, Marvin Gerstin Associates and Marvin Gerstin in No. 88–7257 and No. 88–7260.

Before WALD, Chief Judge, and RUTH BADER GINSBURG and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

Plaintiffs-appellants seek to pursue claims that real estate advertisements placed by defendants-appellees featuring white models to the exclusion of black models violated the Fair Housing Act of 1968

(FHA), 42 U.S.C. §§ 3601–31. The district court held the claims time-barred. We reverse that determination and remand for further proceedings.

The appeal involves consolidated actions against two unrelated sets of defendants. In the first action, commenced in October 1986, the co-defendants are Colonial Village, Inc. (Colonial), owner and manager of a residential condominium in Arlington, Virginia, and Mobil Land Development Corporation (MLDC); Colonial is wholly owned by MLDC which, in turn, is wholly owned by the Mobil Corporation, a publicly-held corporation. In the second action, commenced in November 1986, the co-defendants are Marvin J. Gerstin and the advertising agency he is alleged to own and control, Marvin Gerstin Associates, Inc. Both sets of defendants are charged with running discriminatory ads regularly in *The Washington Post* from January 1985 through the spring of 1986.

Plaintiffs are Girardeau A. Spann, a black resident of the District of Columbia, the Fair Housing Council of Greater Washington, and the Metropolitan Washington Planning & Housing Association. Both organizational plaintiffs are non-profit corporations dedicated to ensuring equality of housing opportunity through education and other efforts. Requesting injunctive relief and damages, plaintiffs rely primarily on section 804(c) of the FHA, which declares it unlawful

> [t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make such preference, limitation, or discrimination.

42 U.S.C. § 3604(c). Plaintiffs additionally assert 42 U.S.C. §§ 1981, 1982 in support of their claims.

The procedural course of this litigation has not been smooth. We describe it summarily. After consolidating the two cases in January 1987, the district court scheduled briefing on dispositive motions. In May 1987, that court ruled for defendants 1) dismissing for failure to state a claim upon which relief can be granted plaintiffs' pleas under 42 U.S.C. §§ 1981, 1982, and 2) granting summary judgment striking out the FHA claims as time-barred. *Spann v. Colonial Village, Inc.*, 662 F.Supp. 541 (D.D.C.1987).

Plaintiffs' appeal from the district court's May 1987 decision was aborted when Colonial moved in this court to dismiss for want of the requisite finality. Colonial pointed out that the district court had left unaddressed co-defendant MLDC's objection that MLDC was neither properly served nor amenable to service in the District of Columbia. A motions panel of this court, in response to Colonial's plea, dismissed the appeal "without prejudice for lack of a final order under Fed.R.Civ.P. 54(b) and 28 U.S.C. § 1291." *Spann v. Colonial Village, Inc.*, Nos. 87–7118 & 87–7119 (D.C.Cir. Apr. 6, 1988).

The district court then endeavored to "make[ ] the judgment in these cases final." In an October 1988 decision, that court resolved two matters: (1) it denied MLDC's motion to dismiss or quash service of process; and (2) it dismissed the Gerstin defendants' motion for sanctions under Fed.R.Civ.P. 11. *Spann v. Colonial Village, Inc.*, 124 F.R.D. 1, 2 (D.D.C.1988). As to the former, the district court concluded that, because MLDC was notified of the suit through service on Colonial, its subsidiary, "service was properly effected on [MLDC]." *Id.* at 3. On sanctions, the district court found the Gerstins' application "frivolous," because plaintiffs' assertions had a "reasonably defensible basis in fact and law." *Id.*

Plaintiffs once again appeal. We take up first the question of standing and explain why the organizational plaintiffs meet that threshold requirement. We next address the timeliness of the appeal, and the issue of personal jurisdiction over MLDC. Finally, we consider the vitality of the claims in suit, and hold that the FHA claims were not pursued too late.

*Standing*

■ The initial issue in these cases is whether plaintiffs possess standing to invoke the jurisdiction of the federal courts. No "prudential standing" inquiry is in order, however, because Congress intended standing under the Fair Housing Act to extend to the full limits of Article III. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1982). We therefore consider only core Article III standing.

■ The plaintiff organizations, the Metropolitan Washington Planning & Housing Association (MWPHA) and the Fair Housing Council of Greater Washington (FHC), assert standing to sue on their own behalf, and we turn now to those assertions. An organization has standing on its own behalf if it meets the same standing test that applies to individuals. The organization must show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

Accordingly, just as an individual lacks standing to assert " 'generalized grievances' about the conduct of Government," *see Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974), so an "organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976) (citing *Sierra Club v. Morton,* 405 U.S. 727, 738–40, 92 S.Ct. 1361, 1367–68, 31 L.Ed.2d 636 (1971)); *see Capital Legal Found. v. Commodity Credit Corp.,* 711 F.2d 253, 255 (D.C.Cir.1983) (private organization with "vibrant interest in," but not "adversely affected" by, challenged agency action lacks standing). If, however, an organization points to a "concrete and demonstrable injury to [its] activities," not "simply a setback to the organization's abstract social interests," the organization will have passed through the first gateway. *Havens,* 455 U.S. at 379, 102 S.Ct. at 1124.

■ That the alleged harm affects the organization's noneconomic interests—for example, its interest in encouraging open housing—"does not deprive the organization of standing." *Id.* at 379 n. 20, 102 S.Ct. at 1124 n. 20 (internal citation omitted). An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation. *See Haitian Refugee Center v. Gracey,* 809 F.2d 794, 799 n. 2 (D.C.Cir.1987) (opinion of Bork, J.). *Havens* makes clear, however, that an organization establishes Article III injury if it alleges that purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action. *See Havens,* 455 U.S. at 379, 102 S.Ct. at 1124.

■ Plaintiff organizations have alleged such injuries here. We first summarize, and then elaborate on, the organizations' allegations. Both MWPHA and FHC have charged that defendants' preferential advertising tended to steer black home buyers and renters away from the advertised complexes and thus impelled the organizations to devote resources to checking or neutralizing the ads' adverse impact. The organizations also claimed that the advertisements required them to devote more time, effort, and money to endeavors designed to educate not only black home buyers and renters, but the D.C. area real estate industry and the public that racial preference in housing is indeed illegal.

Relating the organizations' claim to standing in more detail, we begin with the statute. Section 804(c) of the Fair Housing Act prohibits any advertisement that "indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). Section 812(a) of the Act expressly provides a pri-

vate right of action to enforce the rights created by Section 804. *See id.* § 3612(a).

Plaintiffs complained that the "repeated and continued depiction of white models and the complete absence of black models" in defendants' advertisements "indicate a preference based on race" in violation of the statute. Colonial Complaint ¶ 12, Joint Appendix (J.A.) at 12; Gerstin Complaint ¶ 7, J.A. at 22. Plaintiffs crucially alleged that these advertising practices "interfered with plaintiff FHC and MWPHA's efforts and programs intended to bring about equality of opportunity for minorities and others in housing" and required plaintiffs "to devote scarce resources to identify and counteract defendants' advertising practices." Colonial Complaint ¶ 17, J.A. at 13; Gerstin Complaint ¶ 27, J.A. at 22.

In affidavits submitted to the district court, the executive directors of MWPHA and FHC further related how defendants' advertisements concretely injured the organizations by depleting scarce resources, apart from generating expenditures in these enforcement actions.[1] The directors first charged that defendants' white-only advertising "reinforces archaic stereotypes of segregation in housing" and "encourages discriminatory attitudes." Declaration of Larry Weston, Executive Director MWPHA ¶ 9, J.A. at 118; Declaration of Patricia A. Horton, Executive Director FHC ¶ 11, J.A. at 126. MWPHA's director then alleged that "[t]his directly decreases the effectiveness of the MWPHA's efforts to educate the real estate industry and the community" about laws prohibiting discrimination in housing and "necessitates increased educational efforts to counteract the influence of defendants' discriminatory ads." Declaration of Larry Weston ¶ 9, J.A. at 118. FHC's director made similar allegations about the ads' effects on FHC's education programs.

Both organizations claimed that the advertising "impacts adversely" on the organizations' "real estate testing program by acting as a 'steering' method which discourages black home buyers and renters before they ever reach a particular complex, necessitating the [organizations] to broaden the scope of [their] efforts in order to reach all forms of discriminatory housing practices." Declaration of Patricia A. Horton ¶ 11, J.A. at 126–27; Declaration of Larry Weston ¶ 9, J.A. at 118. MWPHA and FHC reiterated, in line with *Havens Realty*, that they have been "frustrated by defendants' ... practices," which have discouraged black home buyers and renters from considering defendants' housing and required the organizations to expend additional resources to identify and dispel this discouragement. *See Havens*, 455 U.S. at 379, 102 S.Ct. at 1124.

The "drain[s] on the organization[s'] resources" alleged here appear no less palpable or specific than the injuries asserted by the organizational plaintiff in *Havens*. *See Havens*, 455 U.S. at 363, 102 S.Ct. at 1114 (finding sufficient the following statement: "Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices."); *see also Saunders v. General Services Corp.*, 659 F.Supp. 1042, 1052 (E.D.Va.1987) (finding sufficient organizational plaintiffs' complaint allegations, which were substantially identical to those in this case); *Pacific Legal Foundation v. Goyan*, 664 F.2d 1221 (4th Cir.1981) (organization alleged sufficient injury due to increased time and expense necessary for it to monitor FDA activities under new agency regulation). In sum, increased education and counseling

---

1. This court and the district court may properly consider affidavits submitted by the parties, in addition to the complaint, to resolve the standing question. The courts may also permit plaintiffs to amend their complaints to make the necessary allegations. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *see also Gladstone, Realtors v. Vil-lage of Bellwood*, 441 U.S. 91, 95, 113 n. 25, 99 S.Ct. 1601, 1605, 1614 n. 25, 60 L.Ed.2d 66 (1979) (finding standing for some plaintiffs based on allegations in complaints "as illuminated by subsequent discovery" and permitting other plaintiffs "to amend their complaints to include allegations of actual harm").

could plausibly be required, as we earlier indicated, to identify and inform minorities, steered away from defendants' complexes by the challenged ads, that defendants' housing is by law open to all. Educational programs might complementarily be necessary to rebut any public impression the advertisements might generate that racial discrimination in housing is permissible.

MWPHA and FHC thus do not simply claim that they are psychically injured by witnessing noncompliance with the Fair Housing Act. *Cf. Center for Auto Safety v. NHTSA*, 793 F.2d 1322, 1328 n. 41 (D.C. Cir.1986) (damage to interest in fuel conservation not injury); *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1552 (Fed.Cir. 1986) (injury founded on adverse psychological consequences arising from inadvertent support of immoral conduct with which appellants disagree too abstract to satisfy Article III). The organizations instead allege concrete drains on their time and resources. Expenditures to reach out to potential home buyers or renters who are steered away from housing opportunities by discriminatory advertising, or to monitor and to counteract on an ongoing basis public impressions created by defendants' use of print media, are sufficiently tangible to satisfy Article III's injury-in-fact requirement. *See Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937–38 (D.C.Cir.1986) (senior citizen assistance organization had standing where injury was based on programmatic concerns,

not on purely ideological interests in the agency's actions).

■ This adequately asserted depletion of resources is also, as the courts in *Havens* and *Saunders* found, fairly traceable to the alleged racially-preferential advertising and likely to be redressed by court-ordered declaratory relief. The Supreme Court has noted that "in many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases." *See Allen v. Wright*, 468 U.S. 737, 751–52, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). Having made the suggested comparison in this case, we conclude that both plaintiff organizations have standing.[2]

■ Like the organization in *Havens*, MWPHA and FHC must ultimately prove at trial that the defendants' illegal actions actually caused them to suffer the alleged injuries before they will be entitled to judicial relief. *See Havens*, 455 U.S. at 379 n. 21, 102 S.Ct. at 380 n. 21. This effort will require, of course, proof that defendants violated the Act, *i.e.*, that to a "reasonable reader the natural interpretation of defendants' advertisements ... is that they indicate a racial preference" or an intention to make such a preference. *See Saunders*, 659 F.Supp. at 1058 (quoting *United States v. Hunter*, 459 F.2d 205, 215 (4th Cir.), *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972)); *accord. Ragin v. Steiner, Clateman and Assocs.*, 714

2. Because we conclude that the organizations have standing on their own behalf, we do not decide whether individual plaintiff Spann or the organizations as representatives of their members possess standing. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977). Indeed, we could not resolve these questions without remanding to the district court to allow plaintiffs to amend their complaints or to supplement the record. *Cf. Havens*, 455 U.S. at 377–78, 102 S.Ct. at 1123–24 (remanding to "afford [two of the individual] plaintiffs an opportunity to make more definite the allegations of the complaint"). MWPHA and FHC have not clearly charged how the challenged advertisements "deprive[ ] [their members or constituents] of the benefits of living in a racially integrated community." Declaration of Larry Weston ¶ 10, J.A. at 118–19;

Declaration of Patricia A. Horton ¶ 12, J.A. at 127. Plaintiff Spann has alleged only that he "incurred indignation" and "distress" as a result of the alleged violation. Colonial Complaint ¶ 16, J.A. at 13; Gerstin Complaint ¶ 26, J.A. at 22. Although "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing,'" *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206, we question whether Congress intended 804(c) to confer a legal right on all individuals to be free from indignation and distress. *But see Saunders*, 659 F.Supp. at 1053 (mere receipt of preferential advertising violates statute and thus confers standing). We have no doubt, however, that an individual plaintiff who alleged and later proved that an advertisement indicating a racial preference deterred her from seeking housing in the advertised property would possess standing. *See id.*

F.Supp. 709, 713 (S.D.N.Y.1989) (question of fact for jury whether all white advertisements violate 42 U.S.C. § 3604(c)). MWPHA and FHC will also have to prove that this violation actually caused them to expend resources or to suffer some other concrete injury. For example, as previously noted, MWPHA and FHC might prove that the advertisements discouraged potential minority home buyers from attempting to buy homes at defendants' developments and forced the organizations to spend funds informing minority home buyers that the homes are in fact available to them. Or the organizations could show that the ads created a public impression that segregation in housing is legal, thus facilitating discrimination by defendants or other property owners and requiring a consequent increase in the organizations' ·educational programs on the illegality of housing discrimination.

To conclude this discussion of standing, we return to our starting line (*see supra* p. 27) to underscore the difference between this suit and one presenting only abstract concerns or complaints about government policy or conduct. *Cf. Reservists to Stop the War*, 418 U.S. at 217, 94 S.Ct. at 2930; *Sierra Club*, 405 U.S. at 738–40, 92 S.Ct. at 1367–68; *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). The ideological or undifferentiated injury cases, unlike this case, characteristically are suits against the government to compel the state to take, or desist from taking, certain action. Such cases implicate most acutely the separation of powers, which, the Supreme Court instructs, is the "single basic idea" on which the Article III standing requirement is built. *See Allen v. Wright*, 468 U.S. at 752, 104 S.Ct. at 3325; *Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. at 758. The standing barrier, as it operates in undifferentiated injury cases, prevents the courts from interfering in questions that "[o]ur system of

government leaves ... to the political processes." *Reservists to Stop the War*, 418 U.S. at 227, 94 S.Ct. at 2935.

Plaintiffs here do not seek to compel government action, to involve the courts in a matter that could be resolved in the political branches, or simply "to vindicate their own value preferences through the judicial process." *Sierra Club*, 405 U.S. at 740, 92 S.Ct. at 1369. Plaintiffs are private actors suing other private actors, traditional grist for the judicial mill. Their suit does not raise the concerns that may arise when a public agency or officer is sued to achieve change in a government policy. *Cf. Northwest Airlines v. FAA*, 795 F.2d 195, 203 n. 2 (D.C.Cir.1986). To the extent that plaintiffs seek to vindicate values, those values were endorsed by Congress in the Fair Housing Act, the enforcement of which Congress specifically left in the hands of private attorneys general like plaintiffs.[3] Although the Attorney General and the Department of Housing and Urban Development may enforce the Act, their resources are markedly limited. *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972). Congress decided, therefore, to rely primarily on "private suits in which, the Solicitor General [has noted,] the complainants act not only on their own behalf but also 'as private attorneys general in vindicating a policy that Congress considered to be of the highest priority.'" *Id.* (quoting Solicitor General's comments at oral argument).

Enforcement by private attorneys general has become a feature of many modern legislative programs. Congress has recognized the usefulness and the courts have acknowledged the propriety of reliance on an individual or group actually injured, or threatened with injury, to vindicate the public interest. *See, e.g., Allen v. State Board of Elections*, 393 U.S. 544, 556–57,

---

**3.** We do not suggest that separation of powers concerns totally regress so long as (1) Congress, rather than the courts, declares who may sue, and (2) all parties are private rather than public actors. Even in the absence of encroachment by one branch on the domain of another, there may remain as a live issue the appropriate func-

tions of each branch. While congressional intention to authorize an action between private parties thus may not suffice to meet Article III strictures, the will of the legislature "cannot be overlooked in determining whether [plaintiffs] have standing to sue." *Havens*, 455 U.S. at 373, 102 S.Ct. at 1121.

89 S.Ct. 817, 826–27, 22 L.Ed.2d 1 (1969); *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 401–02, 88 S.Ct. 964, 965–66, 19 L.Ed.2d 1263 (1968); *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964). Indeed, such individuals and groups may assert the public interest even when their own interests do not precisely coincide. *See, e.g., FCC v. Sanders*, 309 U.S. 470, 476–77, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940). Plaintiffs' interests here overlap with the public interest in open housing and nondiscriminatory advertising embodied in the Fair Housing Act. The policies of the Act and the concrete injuries alleged by the plaintiff organizations thus intertwine to support plaintiffs' standing to bring this suit.

*Timeliness of Appeal*

We turn next to the timeliness of this appeal. The Gerstin appellees say the appeal in the case against them is too late; MLDC, on the other hand, objects that appellants have come here too soon. We conclude that the case is properly before us as to all appellees.

■ Far from appealing "seventeen months too late," *see* Brief for Appellees Marvin Gerstin Associates, Inc. and Marvin Gerstin at 3, plaintiffs were unable to engage this court's review at an earlier time. The district court's May 1987 decision left issues open as to one of the defendants, *i.e.*, MLDC's service of process/personal jurisdiction objections had not been addressed; the decision was thus unfinished, and therefore remained unripe for appellate review. *See* Fed.R.Civ.P. 54(b); *Cablevision Systems Development Co. v. Motion Picture Ass'n*, 808 F.2d 133, 136 (D.C. Cir.1987) (order deciding fewer than all of several consolidated cases does not become final judgment for purposes of appellate review absent an "express determination" to that effect by the district judge pursuant to Rule 54(b)).

Plaintiffs did attempt an appeal in June 1987, but Colonial Village blocked that move by successfully asserting, as grounds for dismissal, the final judgment rule. *See Spann v. Colonial Village, Inc.*, Nos. 87–7118 & 87–7119 (D.C.Cir. Apr. 6, 1988) (order dismissing consolidated appeals "without prejudice for lack of a final order under Fed.R.Civ.P. 54(b) and 28 U.S.C. § 1291"). At that time, the Gerstin defendants stood silently by. They never urged severance of the claims against them. First, they sought no Rule 54(b) certification from the district court when that court issued the May 1987 unfinished decision. Later, they proposed no deconsolidation in this court to salvage the plaintiffs' June 1987 try for an earlier appeal. They have no tenable basis, therefore, for urging their exemption from the current appeal. In short, this appeal, taken within thirty days of the October 1988 disposition, *see* Fed.R.App.P. 4(a), is not too late.

Nor is the appeal premature, as MLDC contends it is. The district court expressly stated that its October 1988 Memorandum and Order resolving remaining issues "makes judgment in these cases final." *Spann*, 124 F.R.D. at 2. However, that court did not publish its final judgment in a separate document in the manner Fed.R. Civ.P. 58 instructs: "Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)." *See also* Appendix of Forms, Federal Rules of Civil Procedure, Form 32 and accompanying Notes of Advisory Committee on Rules (indicating obligation of district court judge and clerk to see to the prompt preparation and entry of judgment in conformity with Rule 58).

■ The purpose of the "separate document" requirement is explained in the Notes of Advisory Committee on Rules concerning the 1963 Amendment to Rule 58:

Hitherto some difficulty has arisen, chiefly where the court has written an opinion or memorandum containing some apparently directive or dispositive words, e.g., "the plaintiff's motion [for summary judgment] is granted[.]" ... Clerks on occasion have viewed these opinions or memoranda as being in themselves a sufficient basis for entering judgment in the civil docket as provided by Rule 79(a). However, where the opinion or memorandum has not contained all the elements of a judgment or where the judge has

later signed a formal judgment, it has become a matter of doubt whether the purported entry of judgment was effective, starting the time running ... for the purpose of appeal....

The amended rule eliminates these uncertainties by requiring that there be a judgment set out on a separate document—distinct from any opinion or memorandum—which provides the basis for the entry of judgment. That judgments shall be on separate documents is also indicated in Rule 79(b); ....

The separate-document requirement, although a salutary main rule, is not a "categorical imperative." *See Bankers Trust Co. v. Mallis*, 435 U.S. 381, 384, 98 S.Ct. 1117, 1120, 55 L.Ed.2d 357 (1978) (per curiam). Rule 58, as amended in 1963, clarifies that "a party need not file a notice of appeal until a separate judgment has been filed and entered." *Id.* at 385, 98 S.Ct. at 1120 (citing *United States v. Indrelunas*, 411 U.S. 216, 220–22, 93 S.Ct. 1562, 1564, 36 L.Ed.2d 202 (1973)). The Rule thus shelters the right to appeal. But

> [i]f, by error, a separate judgment is not filed before a party appeals, nothing but delay would flow from requiring the court of appeals to dismiss the appeal. Upon dismissal, the district court would simply file and enter the separate judgment, from which a timely appeal would then be taken. Wheels would spin for no practical purpose.

*Id.* (footnote omitted).

 Rule 58, we agree, "must be applied in such a way as to favor the right to appeal." *Matter of Seiscom Delta, Inc.*, 857 F.2d 279, 283 (5th Cir.1988). Thus, "[i]f an appellant files his notice of appeal from a final judgment within the prescribed time after the entry of the judgment as a separate document, his appeal cannot be defeated by the argument that his time to appeal began to run

from the entry of some earlier decision, opinion, or order."

*Id.* at 284 (quoting *Hanson v. Town of Flower Mound*, 679 F.2d 497, 502 (5th Cir. 1982)).[4] Harmoniously, where the separate-document requirement has been overlooked by the district court, so long as "it is clear that the district court has intended a final, appealable judgment, mechanical application of the separate-judgment rule should not be used to require the pointless formality of returning to the district court for ministerial entry of judgment; instead, the right to immediate appeal is favored." *Id.* at 283.

In sum, the district court, in October 1988, took what was plainly meant to be its ultimately dispositive adjudicatory action, constituting its final decision in the case. That decision, we hold, qualifies as "final" for purposes of appellate review pursuant to 28 U.S.C. § 1291 (authorizing review of "final decisions" of district courts). While we are thus satisfied that the appeal is not premature, we emphasize that, to avoid dispute and promote certainty, it is the better practice for the district court to assure as a matter of course the entry of each judgment as a separate document. *See id.* at 284.

### Personal Jurisdiction over MLDC

In an April 11, 1989 order, a motions panel of this court ruled that, because MLDC had not filed a cross-appeal, the court could not entertain MLDC's arguments regarding the absence of personal jurisdiction. That ruling, however, was made without benefit of a full display of the procedural situation in this case; we therefore deem the ruling "without prejudice to reexamination upon full briefing and argument" before the merits panel. *See Association of Investment Brokers v. SEC*, 676 F.2d 857, 863 (D.C.Cir.1982).

 It is true that forum objections, *i.e.*, personal jurisdiction and venue, can be waived at any stage of a proceeding and ordinarily are waived by failure to take a

---

**4.** We recognize that a document labeled "Order" rather than "Judgment" may satisfy Rule 58 sufficiently to start the appeal clock running, if the order is succinctly to the point, and does not have the characteristics of an elaborative opinion. *See United States v. Perez*, 736 F.2d 236, 237–38 (5th Cir.1984) (cautioning against "mindless" application of Rule 58).

cross-appeal. *See United States v. American Ry. Express Co.*, 265 U.S. 425, 435–36 & n. 11, 44 S.Ct. 560, 563–64 & n. 11, 68 L.Ed. 1087 (1924). However, "a cross-appeal is not a jurisdictional requirement," and omission of that proper procedural step can be excused when the circumstances so warrant. *See Freeman v. B & B Assocs.*, 790 F.2d 145, 151 (D.C.Cir.1986).

We conclude that the requisite exceptional circumstances are present here; accordingly, we will take up MLDC's personal jurisdiction challenge. Just as we declined to apply Rule 58 mechanically to insist on a separate-judgment document as a prerequisite to plaintiffs' appeal, so we decline to preclude MLDC from raising objections it plainly intended to preserve. The uncertainty generated by the absence of a judgment conforming to Rule 58's separate-document requirement both explains and excuses MLDC's failure to cross-appeal. Neither plaintiffs nor MLDC should be trapped by the confusion that existed over the timeliness of plaintiffs' appeal.

MLDC complains that process was not properly served on it. More fundamentally, MLDC denies the existence of the minimum contacts with this forum and lawsuit necessary to justify, under due process, maintenance of the action against it. *But cf. Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 418 (9th Cir.1977) (fifth amendment due process, as distinguished from fourteenth amendment, requires sufficient affiliating contacts with the United States, rather than with a particular state). *See also* Committee on Rules of Practice and Procedure, Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure 29–31 (1989) (proposing nationwide service of process in all civil actions arising under federal law).

When this litigation returned to the district court following this court's April 1988 dismissal of the June 1987 appeal for want of a final order, plaintiffs promptly moved for the entry of final judgment. The district court thereupon considered the two matters still open in the consolidated cases: the Gerstin defendants' motion for Rule 11 sanctions against plaintiffs; and MLDC's motion to dismiss on grounds of improper service and lack of the requisite presence in or contacts with the forum. The district court denied the Gerstin defendants' motion for sanctions as baseless, and also denied MLDC's motion. The district court concluded that plaintiffs' several attempts to serve MLDC out-of-state by mail and personal delivery were unavailing; that court held, however, that the proper service made on MLDC's co-defendant and wholly-owned subsidiary, Colonial Village, sufficed to draw in MLDC as well. The district court stated:

> [MLDC] conducts business in this jurisdiction, in many ways, including through Colonial Village, whose employees expressly hold themselves out as agents of [MLDC]. They list the parent corporation on their business cards and advertise [MLDC's] control of the property.

*Spann*, 124 F.R.D. at 2.

Plaintiffs-appellants, in the instant appeal, did not address MLDC's contentions that it was never served properly and that, in any event, it lacks the requisite affiliation with the District. Instead, plaintiffs-appellants argued only that MLDC's personal jurisdiction objections are precluded, an argument we have rejected. *See supra* pp. 32–33. Examining the record ourselves, however, we find (and MLDC concedes) that an officer of Colonial did indeed display a business card identifying Colonial Village, Inc. as "a Mobil company." But that is all we find. If there is more to connect MLDC to this case and forum, *e.g.*, advertisements for Colonial Village mentioning Colonial's affiliation with MLDC, it has not been pointed out to us.

Because we are unable to review intelligently the personal jurisdiction questions (MLDC's affiliation with the District, and the propriety of serving Colonial on MLDC's behalf) on the basis of the thin materials at hand, we return the matter of the amenability of MLDC to suit here for further airing. Noting that the liaison between MLDC and Colonial Village bears not only on the nexus required for personal

jurisdiction and the sufficiency of service of process, but on the merits of the complaint against MLDC as well, we leave it to the district court to decide whether discovery concerning the character of Colonial's advertising and affiliations with MLDC should precede a definitive ruling on personal jurisdiction over MLDC.[5]

### Fair Housing Act Claims

The district court dismissed plaintiffs' FHA claims as time-barred; we reverse that ruling because it erred in its method of determining whether a violative act occurred within the prescribed period.

Currently, the Fair Housing Act has a standard, two-year statute of limitations:

> An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice ... to obtain appropriate relief with respect to such discriminatory housing practice....

42 U.S.C. § 3613(a)(1)(A) (1989). At the time these actions commenced, however, Congress prescribed: "A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory practice occurred." 42 U.S.C. § 3612(a) (1982). Where one discrete act of discrimination was at issue, the prescription was unproblematic: that act had to fall within 180 days of the filing of the court complaint. "Continuing violations," on the other hand, were less readily fitted to the statute's terms. Eventually, the Supreme Court confirmed lower court opinion that

> where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitation period, the complaint is timely when it is filed within 180 days of *the last asserted occurrence* of that practice.

*Havens,* 455 U.S. at 380–81, 102 S.Ct. at 1125 (emphasis added); *see also McKenzie v. Sawyer,* 684 F.2d 62, 72 & n. 8 (D.C.Cir. 1982) (explaining, in the context of Title VII of the Civil Rights Act of 1964, the timeliness of charges of discrimination antedating but persisting into the limitations period, and distinguishing from the time in which to file charges, the time period for which recovery is available).[6]

The district court identified as the relevant time frames in this litigation April 1986 to October 1986 for the complaint against Colonial, and May 1986 to November 1986 for the complaint against the Gerstin defendants. That court arrived at each of these two periods by counting back 180 days from the complaint filing. *See Spann,* 662 F.Supp. at 546. If these frames were the correct ones, the summary judgment for the defendants would have been secure, for in those months, apparently spurred by plaintiffs' administrative complaints,[7] over twenty-eight percent of Colonial's ads published in *The Washington Post* and over forty percent of the

---

**5.** When plaintiffs moved in May 1988 for an order entering final judgment, they asked the district court 1) to deny MLDC's motion to quash service as moot, if that was the court's original intention, or 2) to deny the motion on its merits, or 3) "if the court determines that [MLDC's] motion to quash service ... may not be denied on the present state of the record, then ... [to] permit[ ] discovery as to the issues raised by the motion but grant[ ] a certificate under Rule 54(b) permitting the appeal to proceed ... as to all other parties."

**6.** We recognize that the alleged violations in *Havens* were different from those pressed here. In *Havens,* any one of the acts allegedly committed by the defendant (lying to a tester about the availability of housing) would constitute a violation of § 804(a) of the FHA. Here, by contrast, it is highly unlikely that a single ad containing only white models could alone violate § 804(c). However, in *McKenzie, supra,* we upheld a grant of summary judgment in favor of plaintiffs on their Title VII claim even though no single act of the defendant would likely have violated Title VII. We recognized there that plaintiffs' Title VII claim "rested largely on sheer numbers," 684 F.2d at 68, and looked to defendant's conduct before the actionable period to show the violative character of defendant's conduct in that period. In failing to make an inquiry of the latter kind, the district court erred.

**7.** Several months before instituting court actions, plaintiffs filed administrative complaints with the District of Columbia Office of Human Rights and the United States Department of Housing and Urban Development.

Gerstin ads published in *The Post* featured black models. *See id.* at 543.[8]

 But plaintiffs' complaints are not centered on those periods. Instead, plaintiffs complain of periods in which both Colonial and the Gerstin defendants featured *exclusively* white models. In the case against Colonial, that period runs from January 1985 to April 1986, and in the case against the Gerstin defendants, the relevant time frame is January 1985 to May 1986. In each case, the last of the long stream of all white ads, plaintiffs allege, occurred within the 180–day zone, *i.e.*, in April or May 1986; thus, under the "continuing violation"/"last asserted occurrence" theory that the Supreme Court has advanced, *see supra* p. 34, the plaintiffs claims are not time-barred.[9]

*Section 1981 and 1982 Claims*

The provisions of 42 U.S.C. §§ 1981, 1982, the Supreme Court has restated, have a limited province and do not qualify as all-purpose antidiscrimination or comprehensive open housing laws; in particular, the High Court has said that section 1982 "does not prohibit [real estate] advertising or other [dwelling place sale or rental] representations that indicate discriminatory preferences." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968); *see also Patterson v. McLean Credit Union*, — U.S. ——, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989) (construing § 1981 in light of § 1982). The district court properly dismissed the claims plaintiffs attempted to

state under the headings of these post–Civil War civil rights measures, *see Spann*, 662 F.Supp. at 547, and we have no cause to add to that court's statement.

*Conclusion*

For the reasons stated, we reverse the district court's ruling that plaintiffs' Fair Housing Act claims are time-barred and we return the case for further proceedings consistent with this opinion.

*It is so ordered.*

---

8. In another case brought by the same plaintiffs, the district court said it had held in this case only "that if in real estate advertisements some photographs feature white models, some black models, and some of both, no violation of the [Fair Housing] Act occurs merely because the races are not represented proportionately to population, or because black models are not included in every display, unless an intention to discriminate is shown by extrinsic evidence." *Spann v. The Carley Capital Group*, Nos. 87–1154 & 87–1155, slip op. at 7, 1988 WL 166665 (D.D.C. Dec. 12, 1988).

9. The district court appeared to recognize in its second encounter with this case that its initial time-bar decision bore reexamination. Dismiss-

ing the Gerstin defendants' motion for sanctions, the district court said:

> [D]efendants contend that their advertising during the 180 days prior to the filing of the complaint does not indicate a racial preference, and that the complaint is therefore without basis in fact. In fact, however, the complaint of racial preference in defendants' ads is not limited to that time period. Only the last asserted occurrence of a practice of racial preference need be in that 180 day period. In its Opinion of May 22, 1987, the Court found that the last of defendants' all-white ads was published within the 180–day limitations period beginning on May 24, 1986.

*Spann*, 124 F.R.D. at 3.