**NATIONAL TREASURY EMPLOYEES UNION, Robert M. Tobias, Frank Heffler, and Gail McKinney, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civil Action No. 96–624 (CRR).**

United States District Court,
District of Columbia.

July 3, 1996.

Gregory O'Duden, General Counsel, National Treasury Employees Union, Washington, DC, with whom Elaine Kaplan, Deputy General Counsel, and Barbara A. Atkin, Associate General Counsel for Appellate Litigation, National Treasury Employees Union, were on the briefs, for plaintiffs.

Neil H. Koslowe, Special Litigation Counsel, Civil Division, United States Department of Justice, Washington, DC, with whom Frank W. Hunger, Assistant Attorney General, United States Department of Justice, David J. Anderson, United States Department of Justice, and Eric H. Holder, United States Attorney for the District of Columbia, were on the briefs, for defendant.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

Before the Court in the above-captioned case is the defendant's Motion to Dismiss the plaintiffs' challenge to the Line Item Veto Act. As grounds therefor, the defendant argues that the matter is currently nonjusticiable and that the plaintiffs lack standing to sue. Upon careful consideration of the parties' pleadings, the entire record herein, the arguments of counsel at today's hearing, and the applicable law, the Court shall grant the defendant's Motion to Dismiss for lack of standing.

## BACKGROUND

On April 9, 1996, the President approved the Line Item Veto Act, as enacted by Congress. Pub.L. No. 104–130, 110 Stat. 1200 (1996) (to be codified at 2 U.S.C. §§ 681 note, 691, *et seq.*) The purpose of the Act is "to give the President line item veto authority with respect to appropriations, new direct spending, and limited tax benefits." *Id.,* Preamble.

The Act and the amendments it makes take effect only after the earlier of the enactment into law, pursuant to Article I, section 7, of the Constitution, of an Act to provide for a seven-year plan for deficit reduction and to achieve a balanced budget or January 1, 1997. 2 U.S.C. 691 note.[1] When either of the events occurs, the President will then be authorized, with respect to any bill or joint resolution signed into law pursuant to Article I, section 7, to "cancel in whole" any dollar amount of "discretionary budget authority," any item of "new direct spending" or any "limited tax benefit," as those terms are defined in the Act, if the President determines that the "cancellation" will "reduce the Federal budget deficit," "not impair any essential

---

1. The Act further provides that it "shall have no force or effect on or after January 1, 2005." *Id.*

Government function," and "not harm the national interest ..." 2 U.S.C. § 691(a).[2]

The President must notify Congress of a cancellation by transmitting a "special message" within five calendar days after the enactment of the law to which the cancellation applies. 2 U.S.C. § 691(a)(3)(B). The Act specifies the contents of the special message, and requires that it shall be printed in the first issue of the Federal Register published after the message is transmitted to Congress. 2 U.S.C. § 691a(b)(1), (c)(2). The cancellation takes effect upon Congress' receipt of the special message and, in the case of discretionary budget authority, results in the simultaneous reduction of the dollar amount of the relevant appropriation. 2 U.S.C. § 691b. The cancellation operates to rescind any dollar amount of discretionary budget authority or to prevent items of new direct spending or limited tax benefits from having legal force or effect. 2 U.S.C. § 691e(4). Both the Office of Management and Budget and the Congressional Budget Office must make designated revisions in budget estimates and reports if a cancellation becomes effective. 2 U.S.C. § 691c.

Under the Act, each special message transmitted by the President is referred to the appropriate congressional committees. 2 U.S.C. § 691d(a). During a congressional review period of 30 days following Congress' receipt of the special message, Members of Congress may introduce, and Congress may consider, a "disapproval bill" under a schedule and procedures spelled out in the Act. 2 U.S.C. § 691d(b)–(f). A disapproval bill is a bill or joint resolution which disapproves of one or more cancellations. 2 U.S.C. § 691e(6). If a disapproval bill is enacted into law, then all cancellation disapproved in that law are null and void. 2 U.S.C. § 691b(a). The Act does not confer authority on the President to cancel any dollar amount of discretionary budget authority, item of new direct spending or limited tax benefit contained in an enacted disapproval bill. 2 U.S.C. § 691(c). A "disapproval bill" must be passed by a majority of both Houses and be signed by the President in order to nullify the President's cancellation. *See* 2 U.S.C. § 691b(a). The cancellation may, however, be overridden by a two-thirds Congressional majority. *See Id.*

The Act provides that any Member of Congress, and any individual "adversely affected" by the Act, may bring an action in this Court for declaratory and injunctive relief "on the ground that any provision of this part violates the Constitution." 2 U.S.C. § 692(a)(1). This provision does not "infringe upon the right of the House of Representatives to intervene" in such an action "without the necessity of adopting a resolution to authorize such intervention." 2 U.S.C. § 692(a)(3). Any order of this Court issued pursuant to an action brought under the Act "shall be reviewable by appeal directly to the Supreme Court of the United States." 2 U.S.C. § 692(b). Moreover, it is the duty of this Court, and the Supreme Court, to advance on the docket and expedite the disposition of an action brought thereunder. 2 U.S.C. § 692(c).

The plaintiffs, a labor organization representing approximately 140,000 federal employees in various departments within the Executive Branch, its president, and two of its members, filed the instant suit on the day the Act was approved by the President. Their challenge is threefold. First, they argue that the Act violates the Presentment Clause, Article I, section 7, by establishing "a procedure at odds with the carefully structured veto requirements" of that Clause. Second, they argue that the Act "represents an abdication of legislative control over the fisc and unconstitutionally shifts lawmaking power to the executive branch, thereby upsetting the Constitution's carefully crafted scheme of checks and balances." And third, they argue that the Act violates Article I, section 5 (which grants each House of Congress the right to determine its own procedural rules) "by prescribing rules of procedure that are binding on both Houses."

---

**2.** In identifying dollar amounts for cancellation, the President must consider the legislative history and purposes of the law containing the dollar amounts, items or benefits, and any specific sources of information to which the law makes reference and use the definitions in the Act. 2 U.S.C. § 691(b).

At the initial status conference, the defendant raised the threshold issue of whether the plaintiffs have standing to challenge the Act. The Court subsequently set a briefing schedule on this issue. The issue having been fully briefed, the Court then held a hearing today. Accordingly, the issue of the plaintiffs' standing is ripe for adjudication.

## DISCUSSION

■ The Court starts from the proposition that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases and controversies." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 37, 96 S.Ct. 1917, 1923, 48 L.Ed.2d 450 (1976). "The 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The doctrine of standing and the related doctrines of mootness, ripeness, and political question "that have grown up to elaborate [the case or controversy requirement] are founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). These are threshold inquiries that "must be answered by reference to the ... Art[icle] III notion that federal courts may exercise power only in the last resort and as a necessity." *Id.*, 468 U.S. at 751, 104 S.Ct. at 3325 (quoting *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892)).

■ Ordinarily, standing analysis is both constitutional and prudential in nature; however, in the instant case, the Court need not consider prudential standing limitations because Congress intended that standing under the Act be coextensive with Article III limitations. 2 U.S.C. § 692(a). *Accord Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C.Cir.), *cert. denied*, 498 U.S. 980, 111 S.Ct. 508, 112 L.Ed.2d 521, 498 U.S. 980, 111

S.Ct. 509, 112 L.Ed.2d 521 (1990). At bottom, "the irreducible constitutional minimum of standing" contains three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 560–61, 112 S.Ct. 2130, 2135, 2136–37, 119 L.Ed.2d 351 (1992) (citations, internal quotations and footnotes omitted). The party invoking federal jurisdiction bears the burden of establishing these elements. *Id.* at 561, 112 S.Ct. at 2136 (citations omitted). The plaintiffs have failed to satisfy that burden in this case.

■ With respect to the first requirement, the injury alleged must be "distinct and palpable," *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206, "particular [and] concrete," *United States v. Richardson*, 418 U.S. 166, 177, 94 S.Ct. 2940, 2946, 41 L.Ed.2d 678 (1974), and "specific [and] objective," *Laird v. Tatum*, 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972). That is to say it cannot be "conjectural [or] hypothetical," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983), "remote [and] unsubstantiated by allegations of fact," *Warth*, 422 U.S. at 507, 95 S.Ct. at 2209, "speculative," *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 42–46, 96 S.Ct. 1917, 1926–28, 48 L.Ed.2d 450 (1976), or "abstract," *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). The plaintiffs allege that the Act injures them in three ways.

First, they claim that, as a result of the Act's "shift of lawmaking power to the President," the compromises that NTEU has achieved through lobbying efforts "are subject to negation, through the exercise of the

President's 'cancellation' authority," and that NTEU "will be required to expend additional time, effort and money, redirecting a portion of its limited resources to the executive branch, thereby diluting the Union's effectiveness." Amended Complaint, Introduction. Second, the plaintiffs claim that, "by acting as a drain on the Union's resources and making it more difficult for the Union to secure the passage of favorable legislation," the Act "directly interferes" with the ability of its president "to accomplish" the Unions' goals, and injures their members by "undermin[ing] the effectiveness of NTEU as their representative before Congress." *Id.* Third, the plaintiffs argue that the Act injures them "in their capacity as voters," because it "unlawfully dilutes the power of their elected representatives over spending measures and over the procedural rules of their legislative Houses, in turn diluting the effectiveness of plaintiffs' votes." *Id.*

■ The injuries that the plaintiffs allege—a redirection of lobbying efforts from the Legislative Branch to the Executive Branch, a diminution of their organization's effectiveness, and a loss of voting power—are too speculative and remote to constitute an injury sufficient to confer standing on the plaintiffs. While the Act may change the way the plaintiff organization chooses to represent its members, it does not perceptibly impair their representation efforts. *See Fair Employment Council v. BMC Mrktg., Corp.,* 28 F.3d 1268, 1276 (D.C.Cir.1994). Moreover, to the extent that the plaintiffs argue that their votes have been diluted by virtue of the transfer of power to the Executive, this injury is shared by the citizenry at large and is not sufficiently particularized to satisfy Article III. *See Schlesinger v. Reservists Cmte. to Stop the War,* 418 U.S. 208, 217–22, 94 S.Ct. 2925, 2930–33, 41 L.Ed.2d 706 (1974).

The plaintiffs rely upon a line of cases in which courts have held that organizations can establish a concrete and demonstrable injury arising from a "purportedly illegal action [that] increases the resources the group must devote to programs independent of its suit challenging the action." *Spann,* 899 F.2d at 27. In these cases the organizations shared a central purpose of eliminating discriminatory housing practices. *See Havens,* 455 U.S. at 379, 102 S.Ct. at 1124, *Fair Employment Council,* 28 F.3d at 1276; *Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer,* 943 F.2d 644, 646 (6th Cir.1991); *Spann,* 899 F.2d at 27–28. Stated in the affirmative, the organizations shared the common aim of promoting fair housing practices. The challenged practices frustrated this aim and thereby "made the [organizations'] overall task more difficult." *Fair Employment Council,* 28 F.3d at 1276. That is to say, the discriminatory actions taken by the defendants squarely countered the plaintiffs' organizational objective and thus "perceptibly impaired" that objective. *Id.*

In addition to the fair housing cases, the plaintiffs rely upon the decision of this Court in *Younger v. Turnage,* 677 F.Supp. 16 (D.D.C.1988) and the decision of Fourth Circuit in *Pacific Legal Found. v. Goyan,* 664 F.2d 1221 (4th Cir.1981).

In *Younger,* this Court held that organizations dedicated to providing assistance to homeless veterans had standing to challenge the alleged failure of the Veterans Administration to meet its obligations under the Veterans Education and Training Acts of 1970, because the plaintiff organizations,

like the plaintiff organization in *Havens Realty,* ... had to devote their limited resources to providing assistance to homeless veterans that, as alleged by the plaintiffs ... [was] the statutory obligation of the VA. The effort expanded by the plaintiff organizations in attempting to see that homeless veterans receive information regarding benefits to which they may be entitled puts a concrete and demonstrable strain on these organizations that they would otherwise devote their limited resources to other assistance efforts on behalf of homeless people.

*Id.* at 21.

In *Pacific Legal Foundation,* the Fourth Circuit upheld the standing of a nonprofit

foundation that regularly participated in proceedings before the Food and Drug Administration to challenge an agency regulation providing for the reimbursement of attorneys fees and costs incurred by qualified participants in agency proceedings. 664 F.2d at 1224. The Fourth Circuit held that, because the foundation would necessarily incur increased time and expense to monitor FDA activities under the new regulation, it had established an injury sufficient to confer upon it standing to challenge the regulation. *Id.*

Unlike the situations presented in *Spann, Havens, Fair Employment Council, Younger and Pacific Legal Foundation* where the challenged action was at loggerheads with the stated mission of the plaintiff organization and the impairment of the organization's purpose was both real and immediate, the alleged impairment of the plaintiffs representation efforts in this case is wholly speculative. The gravamen of the plaintiffs argument is that the President's cancellation authority places the appropriations process under the Sword of Damocles. Thus, the plaintiffs argue, while the representation efforts have traditionally been aimed at securing Congressional support for legislative measures of direct interest to its members, they must now lobby the Executive Branch as well. This, they maintain, constitutes and injury sufficient to confer standing upon them to challenge the Act. The Court disagrees.

Although the diversion of resources to lobby the Executive Branch might well reduce those resources dedicated to lobbying the Legislative Branch, this is quintessentially a strategic choice, *see Fair Employment Council,* 28 F.3d at 1277, which rests on the speculative premise that, but for the countermeasure (undertaking lobbying efforts directed at the Executive Branch), the plaintiffs cannot effectively represent their members. *Havens* and its progeny "did not base standing on the diversion of resources from one program to another, but rather on the alleged injury that the defendants' actions themselves had inflicted upon the or-

ganization's programs," *id.* Although the plaintiffs may choose, in response to the Act, to redirect their lobbying efforts and reallocate their members' resources, it cannot be said that the Act impairs their representative efforts or "injures" them within the meaning of Article III.

As an initial matter, it is not at all clear that the plaintiffs have properly gauged the Act's impact on the appropriations process. Congress may disapprove of the President's exercise of the cancellation authority and a disapproval bill may then garner majority support in both Houses and later be signed into law by the President. 2 U.S.C. § 691b(a)–(c). Even if the President refuses to sign the bill, Congress may override the President's veto by way of a two-thirds majority vote. Of course, the plaintiffs' ultimate concerns will be realized only in the event that the President exercises the cancellation authority with respect to a particular appropriation affecting them and one of these alternatives is ultimately unsuccessful. Still, the plaintiffs argue that, in order to adequately represent their constituents, they must alter their activities in light of this possibility.

The veto authority traditionally enjoyed by the President carries with it the possibility that it may be exercised, under the present law, to the detriment of NTEU members. Indeed, it has been so exercised, as the plaintiffs are well aware. In 1995, the inability of the Congress and the President to agree on a budget and the exercise of the President's veto power resulted in a government shutdown which spawned litigation currently pending before this Court's distinguished colleague, Judge Emmet Sullivan, and to which the plaintiff NTEU is a party. *National Treasury Employees Union v. United States,* Civ.A. Nos. 95–2115(EGS), 95–2153(EGS). There Judge Sullivan denied the plaintiff NTEU's request for a Temporary Restraining Order "prohibit[ing] the United States Government from requiring Federal employees to report to work until such time as the Congress had enacted appropriations covering those employees' positions." *National*

*Treasury Employees Union v. United States,* Civ.A. Nos. 95–2115(EGS), 95–2153(EGS), 1996 WL 23355, at *1 (D.D.C. Jan. 3, 1996).

That the President may, under the Act (which has not yet taken effect), exercise his veto authority with some precision while he is currently limited to accepting or rejecting appropriations bills *in toto* does not, in and of itself, perceptibly impair the plaintiffs' representation efforts. Under the Act's regime, the plaintiffs may choose to dedicate more resources to communicating their constituent needs to Executive Branch officials, but standing requires that the plaintiff have suffered an *injury*, not merely that the plaintiff can identify some way in which the challenged action hypothetically *affects* them. Of course, the question of whether a given action may "affect" someone or something is easily rendered a tautology; the question of whether something "injures" them within the meaning of Article III is not.

By virtue of the foregoing, the Court concludes that the plaintiffs lack standing to challenge the Act before the Court. Therefore, upon careful consideration of the parties' pleadings, the entire record herein, the arguments of counsel at the hearing held this date in the above-captioned matter, and the applicable law, the Court shall enter an Order today consistent with the foregoing Memorandum Opinion granting the defendant's Motion to Dismiss for lack of standing.

### ORDER

Upon careful consideration of the parties' pleadings, the entire record herein, the arguments of counsel at the hearing held this date, and the applicable law, and for the reasons stated in the Court's Memorandum Opinion entered this date in the above-captioned matter, it is, by the Court, this 3rd day of July, 1996

ORDERED that the defendant's Motion to Dismiss for lack of standing shall be, and hereby is, GRANTED; and it is

FURTHER ORDERED that this case shall be, and hereby is, DISMISSED from the dockets of this Court.