**NATIONAL TAXPAYERS UNION, INC., Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 94–5285.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 28, 1995.

Decided Nov. 3, 1995.

Charles F. Rule argued the cause for appellant, with whom Allan B. Moore, Mark R. Levin, Jerald L. Hill, Mark J. Bredemeier and Richard P. Hutchison were on the briefs. Jackson R. Sharman, III entered an appearance for appellant.

Edward T. Perelmuter, pro hac vice, Attorney, United States Department of Justice, argued the cause for appellee, with whom Loretta C. Argrett, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and Gary R. Allen and Teresa E. McLaughlin, Attorneys, United States Department of Justice, were on the brief.

Before: EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Section 13208 of the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, 107 Stat. 312 (1993) ("Section 13208" of "OBRA '93"), approved by President Clinton in August 1993, set the maximum federal estate and gift tax rates at 53% and 55%, effective January 1, 1993. *See* I.R.C. § 2001(c)(1) (Supp. V 1993). National Taxpayers Union ("NTU"), a nonprofit organization formed to promote fair, responsible, and legal revenue-raising practices by the United States government, filed a complaint in the District Court seeking an injunction against enforcement of Section 13208. NTU asserted that it had standing to bring its complaint, both as a representative of its members, and in its own right as an organization injured by Section 13208. On the merits, NTU contended that Section 13208's retroactive rate increase is a direct tax on property gifted or devised, and that such a tax is unconstitutional.

The District Court held that it did not have subject matter jurisdiction over NTU's complaint because of the Anti–Injunction Act, I.R.C. § 7421(a) (1988) ("AIA"), and the Declaratory Judgment Act, 28 U.S.C. § 2201(a) (1988) ("DJA"), which operate coextensively to bar most suits relating to federal taxes, except for actions brought under specific provisions of the Internal Revenue Code. *National Taxpayers Union, Inc. v. United States*, 862 F.Supp. 531, 533 (D.D.C.1994).

We affirm the judgment of the District Court. As an initial matter, we review the threshold issue of NTU's standing, and find that, although it lacks standing to challenge Section 13208 on its own behalf, NTU does have standing to challenge the statute on behalf of its members. However, we agree with the District Court that the AIA and DJA bar NTU's complaint.

## I. Background

NTU is a nonprofit, tax-exempt organization that was founded in 1969. One of its "principal aims is to promote fair, responsible, and legal revenue-raising practices by the United States government." Aff. of David L. Keating ¶ 5 ("Keating Aff.") *reprinted in* Appendix ("App.") G. There are over 250,000 members in the organization, including both individuals and corporations. Some NTU members pay federal taxes, and others "do not but are otherwise affected by them." Brief for Appellant at 6. NTU claims that it is "recognized throughout the country as a preeminent authority on federal tax law and tax policy." Keating Aff. ¶ 4, *reprinted in* App. G.

NTU opposed the first budget bill of the Clinton Administration, OBRA '93, signed by the President on August 10, 1993, focusing in particular on the bill's retroactive revision of federal estate and gift tax rates. Section 13208 of OBRA '93 increased the highest federal estate and gift tax rates to 53% and 55% on a permanent basis, effective January 1, 1993. *See* I.R.C. § 2001(c)(1) (Supp. V 1993). This change was consistent with the maximum federal estate and gift tax rates in effect for most of the decade preceding the enactment of OBRA '93, but it represented an increase of the 50% maximum rate in effect on January 1, 1993. *See* I.R.C. § 2001(c) (1988), *amended by* I.R.C. § 2001(c) (Supp. V 1993).[1]

Shortly after the enactment of OBRA '93, NTU filed a complaint asking the District

---

1. The 53% and 55% estate and gift tax rates had a long legislative history before OBRA '93. They were originally enacted to be in effect only for calendar year 1984, after which the top rate was to drop to 50%. Pub.L. No. 97–34 § 402(a), (b), 95 Stat. 172, 300 (1981). However, Congress extended the 53% and 55% rates through 1987. Pub.L. No. 98–369 § 21, 98 Stat. 494, 506 (1984). In late 1987, Congress again extended the higher rates until January 1, 1993. Pub.L. No. 100–203 § 10401(a), 101 Stat. 1330–430 (1987). Before the 1992 elections, Congress attempted to extend the higher rates once more, but the bill was pocket vetoed by President Bush. *See* H.R. 11 § 3006, *reported in* H.R.Conf.Rep. No. 1034, 102d Cong., 2d Sess. 178–79 (1992). As a consequence, as of January 1, 1993, the top estate and gift tax rate dropped to 50%. In February 1993, the Clinton administration proposed raising rates back to 53% and 55% effective January 1, 1993; this proposal was included in OBRA '93 as enacted.

Court to declare Section 13208 unconstitutional and enjoin its enforcement. In its complaint, NTU asserts that the retroactive estate and gift tax rate increase in Section 13208 is illegal because the increased tax rate upon affected gifts or bequests made between January 1 and August 10, 1993 could not be determined until after the donee's or legatee's rights to the property had been established.[2] Thus, according to NTU, the retroactive tax increase constitutes a direct tax on the property in the hands of the recipient, in violation of the constitutional requirement that direct taxes be apportioned based on the population of the states. *See* U.S. CONST. art. I, § 2, cl. 3 ("[D]irect Taxes shall be apportioned among the several States ... according to their respective Numbers...."); U.S. CONST. art. 1, § 9, cl. 4 (No direct tax "shall be laid, unless in Proportion to the Census...."). NTU also asserts that, because the estate and gift tax is not an income tax, Section 13208's retroactive rate change cannot survive under the Sixteenth Amendment's provision permitting Congress "to lay and collect taxes on incomes ... without apportionment." And, in NTU's view, Section 13208 also violates the Due Process and Takings Clauses.

NTU asserts that Section 13208's enactment has had a detrimental effect on both NTU's income and expenses, because

> [b]oth as written and as it would be enforced, [Section 13208] frustrates Plaintiff's founding objectives and its substantial practical efforts to assist taxpayers and to promote sound, lawful, and fair revenue practices by the United States government, and it has caused and will continue to cause Plaintiff to devote substantial resources to counteract unfair and unconstitutional revenue-raising practices by Defendant.

Compl. for Declaratory and Injunctive Relief ¶ 24, *reprinted in* App. B. This charge is

supported by an affidavit from David L. Keating, Executive Vice President of NTU, declaring

> [a]t least one member of NTU who is adversely affected by Section 13208 has stated to me personally that he does not expect that he can or will give as much financial support to NTU in the future as he would if Section 13208 had not been passed. This member explained to me in no uncertain terms that the new estate and gift tax rates will "absolutely" affect his donations to NTU because they will diminish the funds that he can devote to philanthropic purposes and public interest organizations.

Keating Aff. ¶ 16, *reprinted in* App. G. Keating's affidavit also states that Section 13208 will have the effect of undercutting NTU's fundraising initiatives, including its "Jefferson Club" program, through which donors of $1,000 or more receive special membership benefits, and another program under development that NTU hopes will encourage members "to bequeath contributions to the organization." *Id.* ¶ 17, *reprinted in* App. G.

In addition, NTU asserts that Section 13208 has drained its coffers because "NTU has been forced to expend substantial funds and energy fighting for its repeal," including the cost of participation "in an unsuccessful effort to enact a Senate amendment that would have revoked Section 13208." *Id.* ¶ 18, *reprinted in* App. G. NTU "has also found itself expending substantial efforts to educate its inquisitive members and others about the effects of the provision." *Id.*, *reprinted in* App. G.

Rather than address the merits of NTU's complaint, the District Court focused on whether it had jurisdiction over NTU's claim in light of two statutory provisions that specifically limit suits involving the imposition of federal taxes, the AIA and the DJA.[3] These

---

**2.** Because Section 13208 only changed the maximum estate and gift tax rates, the only gifts and bequests affected by the 53% and 55% rates are those where the donor's or testator's total taxable gifts or estate exceed $2,500,000 or $3,000,000, respectively. *See* I.R.C. § 2001(c)(1) (Supp. V 1993).

**3.** The Anti–Injunction Act, I.R.C. § 7421(a) (1988), provides:

> Except as provided in sections 6212(a) and (c), 6213(a), 6672(b), 6694(c), and 7426(a) and (b)(1), and 7429(b), no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any

statutes provide a virtually exclusive list of the Internal Revenue Code sections under which tax-related suits may be pursued. Although NTU's complaint was not based on any of the enumerated sections, NTU asserted that, because it and some of its members are directly and adversely affected by Section 13208, its complaint should be considered under one of the judicially-created exceptions to the strictures of the AIA and the DJA.

The District Court disagreed, and found that it could not assert jurisdiction over NTU's claim. The trial court first considered whether, under *South Carolina v. Regan*, 465 U.S. 367, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984), NTU met the exception to the AIA for "a plaintiff [who] has no recourse to any alternative legal remedies." *National Taxpayers Union*, 862 F.Supp. at 533. On this point, the District Court decided that NTU is the type of organization specifically excluded from the *South Carolina* exception to the AIA. *Id.* at 534–35.

Next, the District Court found that NTU did not qualify for the other judicially-recognized exception to the AIA set forth in *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). The District Court noted that under *Williams Packing*, the AIA would not apply if the claimant " '(1) was certain to succeed on the merits, and (2) could demonstrate that collection [of the tax] would cause him irreparable harm.' " *National Taxpayers Union*, 862 F.Supp. at 536 (quoting *South Carolina*, 465 U.S. at 374, 104 S.Ct. at 1112). The District Court found NTU's alleged harms— "the drying up of its donations, the costs of

NTU's anti-Section 13028 [sic] education and lobbying efforts, and NTU's moral despair at seeing its goals frustrated"—insufficient to show irreparable injury. *Id.* Finally, the District Court dismissed NTU's proposal that there should be an AIA exception "for the sake of litigation efficiency," on the ground that such a remedy would have to be fashioned by Congress. *Id.* at 537. The trial court also noted that the DJA barred NTU's complaint for the same reasons because the DJA is coterminous with the AIA, and dismissed NTU's case with prejudice. *Id.*

NTU appeals to this court to reverse the District Court's dismissal of its complaint for lack of jurisdiction. NTU also asks that we declare Section 13208 unconstitutional because it violates the Apportionment and Takings Clauses,[4] and that we direct the District Court to enter a judgment for NTU on the merits.

## II. Discussion

■ In a case such as this one, involving a District Court's dismissal of a complaint for lack of subject matter jurisdiction, our standard of review is *de novo*. *Herbert v. National Academy of Sciences*, 974 F.2d 192, 197 (D.C.Cir.1992). However, we must first consider whether NTU has standing to bring this action. *See Humane Soc'y of the United States v. Babbitt*, 46 F.3d 93, 96 (D.C.Cir. 1995) ("We must examine standing on appeal even where, as here, the court below did not address the question....").[5]

### A. Standing

NTU has asserted its claims both as a party injured by Section 13208 and as a

---

person, whether or not such person is the person against whom such tax was assessed. The Declaratory Judgment Act, 28 U.S.C. § 2201(a) (1988), states:

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986 ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

4. NTU abandoned its due process claim for purposes of this appeal, in light of the recent holding

in *United States v. Carlton*, —— U.S. ——, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994), that a retroactive change to Internal Revenue Code provisions affecting the computation of estate taxes did not violate the Due Process Clause. *Id.* at ——––——, 114 S.Ct. at 2023–24. NTU has also dropped its suggestion that the court should recognize an exception to the AIA for reasons of judicial economy.

5. The District Court avoided addressing the issue of standing by proceeding directly to a determination that the AIA and DJA barred NTU's complaint. *National Taxpayers Union*, 862 F.Supp. at 533 n. 5.

representative of its members who have been or may be harmed by that statute. We address these grounds for standing separately, and conclude that, while NTU may not bring this action on its own behalf, it does have standing on behalf of its members who are affected by Section 13208.

### 1. NTU's Standing as an Organization

██ In order for NTU to assert standing to challenge Section 13208 on its own behalf, it must meet the general standing requirements applied to individuals. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). As to these requirements,

> the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42 [96 S.Ct. 1917, 1926, 48 L.Ed.2d 450] (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.,* at 38, 43, 96 S.Ct. at 1924, 1926.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992) (footnote, citations, and internal quotations omitted). Therefore, we must determine whether NTU has alleged such a "personal stake" in the outcome of the controversy as to warrant the invocation of federal-court jurisdiction. *Havens Realty,* 455 U.S. at 378–79, 102 S.Ct. at 1124–25. In particular, NTU must demonstrate that "the organization has suffered injury in fact," including "[s]uch concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] ... more than simply a setback to the organization's abstract social interests." *Id.* at 379, 102 S.Ct. at 1124; *see also American Legal Foundation v. FCC,* 808 F.2d 84, 91 (D.C.Cir.1987). Such a showing requires "more than allegations of damage to an interest in 'seeing' the law obeyed or a social goal furthered." *Id.* at 92. Indeed, "[t]he organization must allege that discrete programmatic concerns are being directly and adversely affected" by the challenged action. *Id.*

We find NTU's alleged injuries insufficient to establish injury in fact. The allegation that Section 13208 has "frustrated" NTU's objectives is the type of abstract concern that does not impart standing. *See, e.g., Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 39–40, 96 S.Ct. 1917, 1924–25, 48 L.Ed.2d 450 (1976) (An organization interested in issues relating to access to medical care "could not establish ... standing simply on the basis of that goal."); *Community Nutrition Inst. v. Block,* 698 F.2d 1239, 1253–54 (D.C.Cir.1983) (A consumer organization could not establish standing "on the basis of its abstract interest in seeing that consumers" receive dairy products at the lowest possible price.), *rev'd on other grounds,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984).

The more specific harms discussed in Keating's affidavit likewise do not rise to the level of the "concrete" injury required for injury in fact. The impact NTU assumes Section 13208 will have on its future fundraising initiatives is entirely speculative, particularly in light of the fact that NTU has not yet implemented one of the programs alleged to have suffered as a result of Section 13208.

NTU's assertion that one of its members has announced that the new estate and gift tax rates will "absolutely" affect his future donations comes closer to actual injury in fact, but still is neither sufficiently concrete nor imminent to confer standing upon NTU. Whether NTU will receive future donations from this particular member and how much those contributions might be is speculative, even without regard to Section 13208. *See Defenders of Wildlife,* 504 U.S. at 564, 112 S.Ct. at 2138 (" '[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the

some day will be—do not support a finding of the 'actual or imminent' injury that our [standing] cases require."). In addition, the only reason offered to explain why Section 13208 will affect the member's contributions is that higher estate and gift tax rates will decrease the member's disposable income at some undetermined point in the future. According to NTU's reasoning, any organization would have standing to contest any Internal Revenue Code provision that increases the tax liability (or other expenses) of one of its members. Because such a result is untenable, we require more concrete allegation of harm to an organization's income before finding sufficient injury in fact.

The impact of Section 13208 upon NTU's programs, such as its educational and legislative initiatives, also does not constitute an injury in fact. "An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.), *cert. denied*, 498 U.S. 980, 111 S.Ct. 508, 509, 112 L.Ed.2d 521 (1990); *see also Association for Retarded Citizens v. Dallas County Mental Health & Mental Retardation Center Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir.1994) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

Similarly, NTU's self-serving observation that it has expended resources to educate its members and others regarding Section 13208 does not present an injury in fact. There is no evidence that Section 13208 has subjected NTU to operational costs beyond those normally expended to review, challenge, and educate the public about revenue-related legislation. Unlike the injury alleged in *Havens Realty*, where the defendant's practices "perceptibly impaired" the plaintiff's ability to provide counseling and referral services for low- and moderate-income homeseekers, 455 U.S. at 379, 102 S.Ct. at 1124, Section 13208 has not forced NTU to expend resources in a manner that keeps NTU from pursuing its true purpose of monitoring the government's revenue practices. *See also Spann*, 899 F.2d

at 28–29 (Housing organizations established injury in fact where defendants' illegal acts necessitated "increased education and counseling ... to identify and inform minorities ... that defendants' housing is by law open to all."). NTU cannot convert its ordinary program costs into an injury in fact from Section 13208.

However, even if we were to find that NTU meets the ordinary constitutional requirements for standing, NTU faces another problem in this case. It is well-recognized that the standing inquiry in tax cases is more restrictive than in other cases. *See, e.g., Eastern Ky. Welfare Rights*, 426 U.S. at 46, 96 S.Ct. at 1927 (Stewart, J., concurring) ("I cannot now imagine a case, at least outside the First Amendment area, where a person whose own tax liability was not affected ever could have standing to litigate the federal tax liability of someone else."); *Fulani v. Brady*, 935 F.2d 1324, 1327 (D.C.Cir.1991) ("While Justice Stewart's separate concurrence does not, of course, constitute binding precedent, we have noted previously that it 'dramatically denotes the special problems attendant upon the establishment of standing in ... tax cases'...." (quoting *American Soc'y of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145, 150 n. 3 (D.C.Cir.1977), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978))), *cert. denied*, 502 U.S. 1048, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992). For example, the Supreme Court has repeatedly held that statutory limits on the form of challenges to tax assessments do not deprive litigants of due process. *See, e.g., Bob Jones Univ. v. Simon*, 416 U.S. 725, 746, 94 S.Ct. 2038, 2050, 40 L.Ed.2d 496 (1974) (The Court dismissed the argument that forcing a petitioner to delay suit against the Internal Revenue Service until after a tax liability was incurred was a violation of due process.); *Dodge v. Osborn*, 240 U.S. 118, 122, 36 S.Ct. 275, 276, 60 L.Ed. 557 (1916) (same). As noted in *South Carolina*, the Supreme Court has expressly disfavored granting taxpayer organizations, such as NTU, standing to challenge the tax liabilities of their members. *See* 465 U.S. at 381 n. 19, 104 S.Ct. at 1115 n. 19.

### 2. NTU's Standing as a Representative of Its Members' Interests

▮ Even though NTU does not itself have standing to challenge Section 13208, it may have standing to attempt to redress the grievances of its members who are affected by Section 13208. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342, 97 S.Ct. 2434, 2440, 53 L.Ed.2d 383 (1977). To establish NTU's "associational" or "representational" standing in this case, we must find that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343, 97 S.Ct. at 2441.

▮ Determination of whether any NTU members would have standing to sue in their own right requires that at least one member demonstrate " 'actual or imminent' 'injury-in-fact' that is 'fairly traceable' to the challenged decision and 'likely' to be 'redressed by a favorable decision.' " *Committee for Effective Cellular Rules v. FCC*, 53 F.3d 1309, 1315 (D.C.Cir.1995) (quoting *Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. at 2136). NTU asserts that at least some of its members will be directly and adversely affected by Section 13208. According to NTU, its members include at least one estate of a testator who died between January 1 and February 25, 1993, leaving a taxable estate subject to the estate tax rate increase enacted in Section 13208, at least one legatee and one executor of such an estate, and at least one donor of a gift conveyed between January 1 and February 25, 1993 subject to Section 13208's gift tax increase. *See* Keating Aff. ¶¶ 12, 13, *reprinted in* App. G. At least one of each of these types of members also belonged to NTU when its complaint was filed on August 27, 1993. *Id.* ¶ 14, *reprinted in* App. G. These members are directly affected by Section 13208 because they bear the burden of an increased estate or gift tax liability as a result of its enactment. Certainly, such injury would be redressed if we were to declare Section 13208 unconstitution-

al. Thus, NTU meets the first prong of the *Hunt* inquiry.

The second *Hunt* requirement is met because a challenge to Section 13208 clearly falls within NTU's stated purpose of "work[ing] to reduce government spending and taxes by a program including but not limited to taxpayer organizing, legislative involvement, and public education." Keating Aff. Ex. B (NTU's Amended Certificate of Incorporation), *reprinted in* App. G.

Finally, NTU's arguments regarding the illegality of Section 13208 constitute a facial challenge to that statute that does not require "individualized proof" from NTU members and could be "properly resolved in a group context." *Hunt*, 432 U.S. at 344, 97 S.Ct. at 2442; *see also Committee for Effective Cellular Rules*, 53 F.3d at 1315 (An organization's broad facial challenge to regulations does not require participation of individual members.). Thus, we find that NTU has standing to bring suit on behalf of its members.

### B. Subject Matter Jurisdiction

Because NTU's claim seeks to set aside a federal tax provision, the traditional standing inquiry is not the only jurisdictional question we must consider. We must also look to whether the complaint is barred by the AIA and DJA, which limit suits relating to federal tax liabilities. Because the AIA and DJA operate coterminously, the following analysis of the impact of the AIA upon NTU's complaint also determines the effect of the DJA. *See Investment Annuity, Inc. v. Blumenthal*, 609 F.2d 1, 4 (D.C.Cir.1979), *cert. denied*, 446 U.S. 981, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980).

It is undisputed that NTU's complaint does not fall within the compass of the Internal Revenue Code provisions for which a statutory exception to the AIA and DJA is provided. Therefore, to avoid the application of the AIA and DJA, NTU must find some other exception. The Supreme Court has noted that the AIA's "language could scarcely be more explicit—'no suit for the purpose of restraining the assessment of collection of any tax shall be maintained in any court....' " *Bob Jones Univ.*, 416 U.S. at

736, 94 S.Ct. at 2045 (quoting I.R.C. § 7421(a)). Nonetheless, the Court has recognized two exceptions to the AIA: when the plaintiff has no alternative legal avenue for challenging a tax, *South Carolina*, 465 U.S. at 373, 104 S.Ct. at 1111, and "if it is clear that under no circumstance could the Government ultimately prevail" and "equity jurisdiction otherwise exists," *Williams Packing*, 370 U.S. at 7, 82 S.Ct. at 1129.

### 1. NTU's Complaint and the *South Carolina* Exception

■ In *South Carolina*, the Supreme Court found that the AIA did not bar the state from suing to enjoin enforcement of a provision of the Internal Revenue Code that directly affected the issuance of state bonds. 465 U.S. at 378–79, 104 S.Ct. at 1114–15. The Court recognized that, unless allowed to bring suit, the state would only be able to vindicate its own interests if it could "convince a taxpayer to raise its claims." *Id.* at 380–81, 104 S.Ct. at 1115. Given this unusual situation, the Court found that "Congress did not intend the [AIA] to apply where an aggrieved party would be required to depend on the mere possibility of persuading a third party to assert his claims." *Id.* at 381, 104 S.Ct. at 1116. Rather, "the [AIA] was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf." *Id.* However, this exception is inapplicable in the instant case, because NTU has no independent standing, and, therefore, has no viable claims to pursue "on its own behalf."

Moreover, even if we assume, *arguendo*, that NTU might have independent standing to challenge Section 13208, it still could not avail itself of the *South Carolina* exception to the AIA, because that exception does not apply to litigation of tax claims by organizations that represent taxpayers. *Id.* at 381 n. 19, 104 S.Ct. at 1115 n. 19. The Court noted that, because the taxpayer members of such organizations "have alternative remedies, it would elevate form over substance to treat such organizations as if they did not possess alternative remedies." *Id.* Thus, because NTU members aggrieved by Section 13208

may challenge that statute in their own right as taxpayers, NTU does not qualify for the *South Carolina* exception to the AIA. *See also Foodservice and Lodging Inst., Inc. v. Regan*, 809 F.2d 842, 844–45 (D.C.Cir.1987) (The *South Carolina* exception to the AIA did not apply to a trade association where members of the association had an avenue to challenge contested income tax regulations on their own behalf.).

### 2. NTU's Complaint and the *Williams Packing* Exception

■ The Supreme Court's decision in *Williams Packing* sets forth a second possible exception to the AIA; under this exception, suit may be brought in the face of the AIA when it is clear that "under no circumstances could the Government ultimately prevail," and "equity jurisdiction otherwise exists." 370 U.S. at 7, 82 S.Ct. at 1129. The exception is unavailing in this case, because NTU members have other adequate remedies to challenge section 13208. *See, e.g., Younger v. Harris*, 401 U.S. 37, 43–44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971) ("[T]he basic doctrine of equity jurisprudence [is] that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.")

Most of the affected NTU members can directly challenge the retroactive application of Section 13208. For example, the estate of the NTU member-testator who died between January 1 and February 25, 1993, can challenge the assessment of an estate tax liability that includes the retroactive rate increase through the estate's executor. *See* I.R.C. § 6903(a) (1988) (A person, such as an executor, acting in a representative capacity, assumes "the powers, rights, duties, and privileges" of the principal under the Internal Revenue Code.). Beneficiaries of an estate for which no executor or representative has been appointed may sue to recover any taxes imposed by Section 13208. *See* I.R.C. § 2203 (1988) ("[A]ny person in actual or constructive possession of any property of the decedent" is considered an executor if none is "appointed, qualified, and acting within the United States."); *DeNiro v. United States*,

561 F.2d 653, 657 (6th Cir.1977) ("Since no personal representative had been appointed [for a decedent's estate], the appellees, as 'executors' under § 2203, should be permitted to seek the [estate tax] refund on behalf of the estate."). In addition, if the Government were to proceed against a legatee to collect estate taxes, the legatee would have standing to contest the assessment. *See, e.g.,* I.R.C. §§ 6901, 6902 (1988).

NTU members affected by Section 13208's gift tax provisions also have the right to challenge that tax. The federal gift tax is the donor's obligation, I.R.C. § 2502(c) (1988), and, therefore, any donors subject to the retroactive gift tax under Section 13208 could contest their own gift tax liability. Donees would be subject to the gift tax liability only if the donor did not pay it, and would then have the ability to personally challenge the tax assessment. *See, e.g.,* I.R.C. §§ 6212, 6213(a), 6324(b), 6901(f), 7403(b) (1988). The only NTU members who could conceivably be left without individual standing to challenge the retroactive impact of Section 13208 are legatees of affected estates in which an executor has been appointed *and* that executor refuses to challenge the tax. In this instance, one or all legatees of that estate may receive less property because the government is receiving more taxes. Such legatees are not entirely without recourse, however, because the estate's executor is bound by a fiduciary duty to represent their interests. *See, e.g., In re Estate of Lamson,* 662 A.2d 287, 288 (N.H.1995) ("[T]he executor owes a fiduciary duty to the estate and heirs . . . ."). Therefore, the legatees can request that the executor challenge Section 13208, and may have recourse to proceed against the executor if he or she refuses to do so. *See, e.g., In re Estate of Ridl,* 455 N.W.2d 188, 193 (N.D.1990) (The court noted that charges for overpaid taxes relating to improperly filed tax returns "generally may be imposed against the personal representative of an estate for the breach of a fiduciary duty."); *In re Estate of Estes,* 654 P.2d 4, 13 (Ariz.Ct.App.1982) (The court found that an executor's erroneous overstatement of estate taxes "and its subsequent refusal to seek a refund constituted a breach of the . . . duty to preserve the property of the estate."); *cf. In re Estate of Maurice,* 433 Pa. 103, 249 A.2d 334, 336 (Pa.1969) (The court found that an undisputed overpayment of estate taxes requires the executor to "prove that, in handling the federal estate tax matters, it used common skill, prudence and due care under the circumstances.").

Although this remedy may not be as ideal as the ability to challenge Section 13208 in one's own name, it is an available remedy. Given the fiduciary relationship between an executor and an estate's legatees, the opportunity to challenge Section 13208 through the executor is a significantly more practical alternative than the option found unacceptable in *South Carolina, i.e.,* requiring the state "to convince a taxpayer to raise its claims." *South Carolina,* 465 U.S. at 380, 104 S.Ct. at 1115; *cf. In re LaSalle Rolling Mills, Inc.,* 832 F.2d 390, 394 (7th Cir.1987) (The court noted that a corporation that might have to rely on its owner-officers to remedy a tax assessment was in a far different situation than South Carolina, which "would have been forced to rely" on "unidentified and unrelated individuals.").[6] Therefore, all of NTU's aggrieved members have some means to redress the injury from Section 13208.

---

6. In addition, the Government suggests that legatees could contest the estate taxes in their own right once the estate has been terminated by bringing their own suits for a refund of taxes paid by the estate, because as transferees of the estate's property, such legatees could then be recognized as "executors" under I.R.C. § 2203, and the logic of *DeNiro,* 561 F.2d at 657. *See* Brief for the Appellee at 19; *cf.* Rev.Rul. 73–366, 1973–2 C.B. 408 ("Generally a claim for refund or credit of an income tax overpayment by a trust or estate discovered after the trust or estate has been finally terminated may be made by" the beneficiaries.). We note that the practicality of such an alternative may be limited by applicable statutes of limitations. *See Fletcher v. United States,* 226 Ct.Cl. 560, 564–65 (1980) (The court applied the statute of limitations found in I.R.C. § 6511(a) to a plaintiff seeking a refund of estate taxes because "as the sole beneficiary thereof, plaintiff succeeded by operation of law to whatever refund claims the estate may originally have had."). Because we find that the legatees' opportunity to challenge Section 13208 through an estate's executor suffices as an effective legal alternative, we do not decide whether this other recourse suggested by the Government is actually available to legatees affected by Section 13208.

**1438**

In any event, it seems highly unlikely that NTU could meet the additional requirement of *Williams Packing* by demonstrating that the Government would not be able to prevail in any circumstance. Although we need not reach the merits of NTU's arguments, we note that there is persuasive precedent indicating that increases in federal estate and gift taxes have been found constitutional, even when applied retroactively. *See, e.g., Milliken v. United States,* 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809 (1931); *cf. First Nat'l Bank v. United States,* 190 Ct.Cl. 400, 420 F.2d 725 (In considering the validity of an excise tax, the court rejected plaintiffs' argument that "the mere retroactive application of a tax ... can convert such tax to a direct levy on property."), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1868, 26 L.Ed.2d 289 (1970). Therefore, it does not appear that NTU could show that there are no circumstances under which the Government could prevail on the merits.

### III. Conclusion

For the reasons heretofore indicated, the judgment of the District Court is affirmed.

*So ordered.*