**NATIONAL LAW CENTER ON HOME-LESSNESS AND POVERTY, et al.,
Appellants,**

v.

**Michael KANTOR, et al., Appellees.**

**No. 94–5312.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 6, 1995.

Decided Aug. 9, 1996.

Bruce J. Casino, Washington, DC, argued the cause for appellants, with whom Daniel E. Loeb and Maria Foscarinis were on the briefs.

Michael S. Raab, Attorney, United States Department of Justice, argued the cause for appellees, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and Mark B. Stern, Attorney, United States Department of Justice, Washington, DC, were on the brief.

Before: WALD, SILBERMAN, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellants appeal the district court's grant of summary judgment on their challenge to the Census Bureau's count of homeless persons during the 1990 census. Appellants lack standing, and therefore we affirm.

## I.

The Census Bureau has, since its creation, undertaken the difficult task of counting homeless persons, originally called "outdoor paupers," as part of the decennial census. Its most recent and most involved effort, Shelter and Street Night (S–Night) in connection with the 1990 census, took place between 6:00 p.m. on March 20 and 8:00 a.m. on March 21, 1990. During S–Night, more than 22,600 enumerators in 5,050 jurisdictions counted homeless persons at 10,600 emergency shelters and 24,300 street locations, thereby adding some 229,000 persons to the rolls. In assembling its list of shelters and street sites, the Bureau contacted roughly 39,000 jurisdictions, 14,200 of which responded, some providing locations frequented by homeless persons, some stating that they had no homeless persons within their borders. Twenty-five jurisdictions with more than 50,000 residents did not respond at all. The Census Bureau consulted with "knowledgeable local persons" in those jurisdictions to add shelter and street locations to its list. S–Night operations took place in every jurisdiction with more than 50,000 residents and in all shelters identified by the Bureau in less populous jurisdictions.

Despite these efforts, the S–Night procedures missed many of the homeless. If they were located in the roughly 34,000 jurisdictions where the Bureau did not send enumerators, they were, of course, not counted.[1] Homeless people who spent S–Night outside shelters or the identified street locations were not counted. These "hidden homeless,"

who slept in "boxes, under tarps, in bushes or trees, shanty structures, automobiles, subways, roofs, dumpsters, or caves," places too dangerous for unaccompanied enumerators to visit, were not counted. *National Law Center on Homelessness & Poverty v. Brown*, Civ. Act. No. 92–2257, Mem. Op. at 4, 1994 WL 521334 (D.D.C. Sept. 15, 1994). Homeless persons who spent S–Night in other locations, including "halfway houses to treat substance abuse, maternity homes for unwed mothers, [and] group homes for the mentally ill," also were not counted on S–Night (though they might have been counted during other census operations). *Id.* at 5 n. 4. The Census Bureau commissioned independent observers to monitor S–Night in Chicago, Los Angeles, New Orleans, New York, and Phoenix. The observers concluded that, even at the street sites where enumerators were sent, between 29 and 72% of the homeless were missed. A review of the S–Night's shelter portion concluded that as many as 48% of the shelters identified by the observers were not on the Bureau's list. The Bureau, when it released the S–Night figures, noted many but not all of these limitations on the S–Night data both in its press release and in information included with the data.

Appellants—the cities of Baltimore and San Francisco, the United States Conference of Mayors, one national and five regional homeless advocacy groups, twelve providers of services to homeless persons, eight homeless persons, and three registered voters—sued, *inter alia*, the Secretary of Commerce and the Census Bureau. The plaintiffs disputed the count of homeless in the census as too low and contended that the government's procedures violated the Census Clause, its implementing statutes, and the Equal Protection Clause. The Bureau's unwillingness to publish a more comprehensive disclaimer setting forth the data's inadequacies was alleged to violate the APA. Pretermitting the plaintiffs' standing, the district court granted the government summary judgment on the

---

1. The number 34,000, we are told, is exaggerated. Many of the 39,000 jurisdictions contacted overlapped in area and population with others such that at least some persons counted in the 5,050 jurisdictions enumerated on S–Night might

also have been located in some of the 34,000 jurisdictions not enumerated. In any event, it is undisputed that no S–Night efforts took place in a large number of jurisdictions.

merits. The court determined that review of S–Night under the APA was foreclosed by *Franklin v. Massachusetts,* 505 U.S. 788, 796–99, 112 S.Ct. 2767, 2773–74, 120 L.Ed.2d 636 (1992), and rejected appellants' constitutional and statutory claims.

## II.

Appellants reiterate their challenges to the census before us. But we are obliged to consider first their standing to raise them. The district court thought the "standing issues this case presents involve several different types of plaintiffs, and their resolution would involve contemplation of sensitive constitutional issues," and avoided them because "[c]ourts should confront such issues only where 'absolutely necessary to a decision of the case.'" *National Law Center on Homelessness & Poverty,* Mem. Op. at 8 (quoting *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)).

■ This approach is fundamentally at odds with the constitutional case and controversy limitation on the jurisdiction of federal courts. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607–08, 107 L.Ed.2d 603 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'") (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)); *Humane Soc'y of the United States v. Babbitt,* 46 F.3d 93, 96 (D.C.Cir.1995). If plaintiffs lack standing, there is not a case or controversy and therefore a federal court should take no action beyond dismissal for lack of jurisdiction. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). To be sure, we have fashioned an extremely narrow exception (rather controversial at that, *see Cross–Sound Ferry Servs., Inc. v. ICC,* 934 F.2d 327, 339–346 (D.C.Cir.1991) (Thomas, J., concurring)), to our obligation to determine our jurisdiction: "'when the merits of a case are clearly against the party seeking to invoke the court's jurisdiction, the jurisdictional question is especially difficult and far-reaching,

and the inadequacies in the record or briefing make the case a poor vehicle for deciding the jurisdictional question, we may rule on the merits without reaching' the jurisdictional contention." *Cross–Sound Ferry Servs., Inc.,* 934 F.2d at 333 (quoting *Adams v. Vance,* 570 F.2d 950, 954 n. 7 (D.C.Cir.1978)); *see also Burlington Northern R.R. Co. v. ICC,* 985 F.2d 589, 593–94 (D.C.Cir.1993) (court did not resolve "exceptionally difficult" jurisdictional question where merits in portion of case over which jurisdiction was contested were necessarily resolved in portion of case over which jurisdiction was clear). The district court may have had this exception in mind, but this is not the rare case that occasions resort to it.

Although the parties fought a pitched battle over standing below, following the district court's lead, they mentioned it only in passing before us. In the district court filings, appellants, which fall into three broad categories, point to a variety of distinct injuries. Advocates for the homeless assert their efforts to achieve their "fundamental purposes" have been frustrated because S–Night's artificially low homeless count and the Bureau's inadequate disclaimer make it more difficult for these organizations to gain benefits for homeless persons. They claim to have been forced to expend their resources counteracting the misinformation resulting from S–Night and gathering and disseminating accurate information. Recipients of federal funds—municipalities, shelter and service providers, and individual homeless persons—assert that the homeless undercount will reduce the federal funds they receive from programs that disburse monies based on census data. Individual registered voters contend that the undercount diluted their votes relative to voters within and without their states. All appellants therefore seek a declaration that the census' shortcomings violate the Constitution and laws of the United States, an order to the Bureau to adopt an assertedly better disclaimer, the appointment of a special commission to establish a better means of counting the homeless, and an order to the Bureau to conduct a new homeless count in accordance with the commission's findings.

### III.

■ Appellants, as the "party invoking federal jurisdiction," must show injury in fact fairly traceable to the defendants' actions and likely to be redressed by a favorable decision. *Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. at 2136–37. Since the district court dismissed the case at the summary judgment stage, appellants "can no longer rest on ... 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' FED.RULE CIV.PROC. 56(e)," *id.,* 504 U.S. at 561, 112 S.Ct. at 2137, supporting these contentions.

### A.

■ Homeless advocates put their injury on grounds that the fundamental purposes of their organizations have been frustrated and that they have had to expend the resources to counter the Bureau's alleged violations. The National Law Center on Homelessness and Poverty (NLC) lists its purposes as:

> vindicating the legal rights of the homeless and poor; ensuring that homeless and poor persons receive their fair share of assistance under existing federal programs; ensuring that homeless and poor persons receive fair political representation; educating the public by disseminating accurate information about homelessness and poverty; and developing and pressing for new public policies to end homelessness.[2]

Although these objectives are undeniably quite broad, we cannot discern any interference with them caused by S–Night. We do not see any connection—and none is suggested—between an undercount of the homeless and the frustration of NLC's purpose to ensure that homeless persons receive their "fair share of assistance under existing federal programs," or its efforts to "vindicat[e] the legal rights of the homeless and poor." It is certainly not apparent from appellants' affidavits why a homeless undercount makes it more difficult to aid any particular homeless person or groups of the homeless in receiving funds under an existing program or vindicating their rights. NLC also contends that it "works to ensure that homeless persons receive fair political representation ... including promoting policies to ensure that homeless persons are permitted to register to vote, promoting efforts to register homeless voters, and promoting efforts to encourage homeless persons to vote." But it is also not apparent why an undercount of the total number of homeless would affect NLC's efforts to encourage the homeless to vote. NLC has not suggested that it, in any way, relies on census numbers to target the homeless.

That leaves NLC's objective to "educat[e] the public by disseminating accurate information about homelessness and poverty" and to "develop[ ] and press[ ] for new public policies to end homelessness." According to its affidavit, the failure of the Census Bureau "properly to enumerate the nation's homeless" has caused NLC to "devote[ ] substantial resources to gathering information from numerous other sources in an effort to piece together estimates of the homeless population ... in order to fulfill its purpose of providing accurate information on homeless-

---

2. The affidavits of advocacy groups other than NLC are generally to like effect. Where they differ, they offer a less compelling case for organizational standing. *Compare, e.g.,* Decl. of Robert Erlenbusch Memorandum of Points and Authorities in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment (Feb. 9, 1993), Exh. 15 at 1–2 ("The Census Bureau's exclusion of homeless persons from the decennial Census will undermine the [Los Angeles County Coalition to End Homelessness's] attempts to advocate for and educate about homeless persons by giving the public an inaccurate picture of homelessness.") *with Community for Creative Non–Violence v. Pierce,* 814 F.2d 663, 669 (D.C.Cir.1987) (possibility that government homelessness report will cause persons "no longer [to] perceive homelessness as a severe and pressing problem," thereby lending them to reduce contributions of time, money, and resources, does not give standing to challenge the report). The United States Conference of Mayors averred injury to its organizational purposes in the complaint, but provides nothing in its affidavit concerning frustration of its fundamental purpose. Also in the complaint, the Conference alleged that "as the representative of its member mayors, [it] will continue to be injured by virtue of the underallocation of federal government monies to cities of whom its members are mayors." As is demonstrated *infra,* we cannot determine whether S–Night has caused any city—much less any city's mayor—funding injury.

ness and poverty." This information-dissemination objective, however, appears not to be free standing, but ancillary to NLC's general approach of gaining governmental responses to improve the lot of the homeless. (NLC does not claim to be a news reporting agency.) Appellants implicitly claim that an undercount of homeless would lead the public and thereby the government to provide less support to the homeless. But that is the far end of speculation. How the American people would react to a census count that would arguably show more homeless than S–Night counted is surely imponderable. And how that reaction would translate into a governmental response is even more imponderable.[3] It is by no means inevitable or even likely that Congress would respond by *increasing* resources for the homeless. Instead, Congress might (as has been suggested for the welfare population) look to disincentives which actually would decrease resources for the homeless.[4] In *Community for Creative Non–Violence v. Pierce,* 814 F.2d 663, 669 (D.C.Cir.1987), we rejected as too tenuous the argument that a governmental report that allegedly downplayed the homelessness problem would lead to less support for homeless persons. The contention that a larger homeless count would lead to greater allocations seems at least equally conjectural.

For this reason, appellants' reliance on *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), and *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 28–29 (D.C.Cir.), *cert. denied,* 498 U.S. 980, 111 S.Ct. 508, 509, 112 L.Ed.2d 521 (1990) *and* 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991), does not help them. In those cases, fair housing advocates were forced to expend resources to counter defendants' "racial steering" practices that had diverted minority persons away from available housing. In *Spann,* housing advertisements exclusively depicting white models were said to "indicate a preference based on race" which discouraged non-white applicants from responding. We held that:

> increased education and counseling could plausibly be required ... to identify and inform minorities, steered away from defendants' complexes by the challenged ads, that defendants' housing is by law open to all. Educational programs might complementarily be necessary to rebut any public impression the advertisements might generate that racial discrimination in housing is permissible.

*Id.* Defendants' dissemination of inaccurate information implying that housing was only available to whites erected barriers to realization of the fair housing advocates' purpose of securing "equality of opportunity for minorities and others in housing." *Id.* at 28. Part of the housing market appeared foreclosed to those minorities, and the fair housing advocates were compelled to provide accurate information to those minorities to overcome these artificial barriers. Appellants do not show that a homeless undercount similarly imposes any such barriers to either the homeless or their advocates.

Even if NLC had an independent, information-dissemination purpose—unrelated to policy objectives—we can discern no injury. Since NLC does not claim to rely on census data for the information it ordinarily disseminates, it cannot very well claim that its information-gathering efforts have been hampered because one of its sources has been compromised. NLC collected and disseminated information on the homeless before S–Night, and has done so since. Its expenditures on gathering and publishing homeless-

---

**3.** It follows that appellants cannot claim that they are injured by the inadequacy of the Bureau's disclaimer. Without any idea what would be the effects on appellants' organizational purposes of either perfect or perfectly dreadful S–Night data, we surely cannot know what effect, if any, a complete disclaimer would have had. We wonder if it would have had any: the shortcomings of S–Night argued before us were presented also to Congress. *See Joint Hearing on Quality and Limitations of the S–Night Homeless Count Before the Subcomm. on Government Information*

*and Regulation of the Senate Comm. on Governmental Affairs and the Subcomm. on Census and Population of the House Comm. on Post Office and Civil Service,* 102nd Cong., 1st Sess. 26–50 (1991).

**4.** Appellants do not contend, nor do we think they could establish, that they are injured as competitors—*i.e.,* that they are disadvantaged *vis-a-vis* a direct competitor in a contest for, say, federal funds.

ness data appear to be part of its ordinary program expenditures. In *National Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1434 (D.C.Cir.1995), an organization challenging a change in the federal gift tax rates sought to establish standing by noting that "it ha[d] expended resources to educate its members and others regarding [the challenged section.]" But there was "no evidence that [the challenged section] ha[d] subjected NTU to operational costs beyond those normally expended to review, challenge, and educate the public about revenue-related legislation." *Id.* Similarly, here, NLC's efforts at gathering information appear wholly unrelated to the census data.

If the organizational appellants established injury, they would face another problem, which all other appellants encounter—causation. To demonstrate that their injury was caused by the S–Night count, appellants must show that the homeless were improperly undercounted by the S–Night methodology *as compared to a feasible, alternative methodology. See Franklin,* 505 U.S. at 802, 112 S.Ct. at 2776 (plurality) (challengers to the allocation of overseas employees among states had "neither alleged nor shown ... that Massachusetts would have an additional Representative if the allocation had been done using some other source of 'more accurate' data" and accordingly did not have standing "to challenge the accuracy of the data used in making that allocation"). If any other methodology would have produced comparably limited results, then the Bureau's selection of the S–Night procedure has caused appellants no injury.

Appellants, of course, do not assert that the homeless could be counted by any method with absolute accuracy. But they do not present an alternative approach that, taking into account all the peculiar factors that make counting the homeless inherently difficult, promises any significantly different result. Below, appellants suggested some steps that the Bureau could have taken to "include both the 'hidden homeless' and the omitted jurisdictions in its enumeration." These include supplementing the nighttime count with "a daytime count over a period of time," follow-up interviews after S–Night,

and statistical sampling and projection methods. While appellants need not identify an enumeration methodology free from all doubt or controversy, it is not clear from the affidavits before us that these suggested changes in the enumeration procedures would yield a higher number of homeless. Appellants do not, for example, offer a solution to the "double-counting" problem. The Census Bureau concluded that efforts to record homeless persons' names might actually increase their resistance to being counted, reducing S–Night's effectiveness. Accordingly, many homeless persons on S–Night were counted without providing their names or, often, without their knowledge. Any *post hoc* effort to supplement S–Night might have counted these persons twice. But any effort to reduce the double-counting problem (by, for example, requiring counted persons to provide their names) may have reduced the number of people who were counted in the first place. One of appellants' submissions acknowledges the double-counting problem and suggests interviewing homeless persons to avoid it. No mention is made, however, of the possible deterrent effect on the initial count of using interviews.

As a corollary to appellants' difficulties in establishing causation—indeed reflective of those difficulties—appellants do not demonstrate that our order will redress their injury. They do not even ask that the alternative methodologies suggested in their affidavits be employed in a recount. Rather, they would have us appoint a commission to formulate a better methodology. We can hardly assume that a commission of as-yet unnamed persons, using as-yet unidentified methodologies, will devise a better homeless count that will redound to appellants' benefit.

### B.

■ Recipients of federal funds—the cities of Baltimore and San Francisco, the providers of services to the homeless, and homeless individuals—contend that S–Night's undercount will reduce the monies that they receive under programs that base disbursements on census data. The cities receive federal monies pursuant to a host of "census-

based" programs both directly and through Maryland and California. The various shelter and service providers also receive federal funds, typically under the Federal Emergency Management Agency's (FEMA) Emergency Food and Shelter (EFS) National Board Program and the Community Development Block Grant (CDBG) program. Individual homeless appellants are beneficiaries of federal funds through the services of appellant providers and others like them. Thus, the causal chain between the Bureau's actions and these appellants is one link longer than that of appellant providers. So we may assume that if cities or providers who serve these individuals have not established standing, neither have the individuals. Appellants assert injury in fact by contending that they have lost or will lose money in the aftermath of the census. But they do not explain how the census or the S–Night procedures on which they focus caused these losses. Our review of programs singled out by appellants reveals that appellants may be better off than they would have been after a hypothetical more accurate homeless count. Three examples will suffice to demonstrate their difficulty.

Most of the service providers allege that they receive money from FEMA's EFS National Board Program and contend that "FEMA money is allocated on a formula based on decennial Census data." That the formula is census-based, however, does not mean that a better homeless count would have affected any provider's EFS receipts. The Deputy Chairman of the EFS National Board, Richard A. Robuck, states in his affidavit that the EFS program's formula "uses unemployment rates and poverty rates to qualify a community for funding. . . . While the [census-based] poverty rate can qualify a community for funding, the actual allocation dollar amount is determined by the average number of unemployed as derived from the Bureau of Labor Statistics (BLS) numbers." It appears, then, that providers who already receive funding (*i.e.*, all appellant providers) have enjoyed all the benefit that the census numbers afford—qualification—and a higher count of the homeless would not have aided them further. Robuck's affidavit also notes that Congress appropriates a fixed sum for

the EFS program, and disbursements are based on a per-capita amount for each unemployed person in a qualifying community. If a better count revealed more homeless persons throughout the nation and led to the qualification of more communities, already-qualified communities might have seen their shares reduced. These communities, perhaps including Baltimore and San Francisco, might thus be worse off under another, improved methodology.

That hypothetical better count's effect on receipts under the CDBG program—under which almost all of the service providers claim to receive funds—is similarly indeterminate. According to James R. Broughman, the Department of Housing and Urban Development official charged with management of the program, one factor in the formula by which CDBG funds are disbursed to communities, including Baltimore and San Francisco, is "population growth lag," a measure of community growth since 1960 in comparison to the growth of other entitled grantees. To determine whether and how a population-growth-lag community's receipts would be affected by a different count, we would not only need to know how many persons would be added to the rolls, but how the new population count compares to that community's population over the last three decades, and how the growth since 1960 compares to the growth of other communities. We have not been provided any of this information. Broughman also notes that Congress authorizes a fixed amount of money for the CDBG program. As with the EFS program, if a more accurate count had caused some communities to become eligible for larger disbursements, San Francisco and Baltimore might have had to make do with less.

Finally, appellants point to the Protection and Advocacy for Mentally Ill Individuals Act of 1986, Pub.L. No. 99–319, 100 Stat. 478 (1986), *amend. not in relevant part*, Pub.L. No. 102–173, 105 Stat. 1217 (1991), as an example of a program for which "census data obviously are a key factor in determining the total allocation," although it "utilize[s] other factors along with Census Bureau population and poverty data." Fifty percent of allocations under the Act are based on a recipient's

*state's* census population as a percentage of the national census population. *See* Pub.L. No. 99–319, § 112, 100 Stat. 478, 483. But, we cannot tell whether San Francisco or Baltimore, which apparently receive monies under the Act, would have gained from a better count. Even if such a count had yielded a much larger homeless population in San Francisco, the overall increase in the total population of *California* may have been small relative to the overall increase in the national population from the better count. In these circumstances, the ratio of California's population to the national population would have decreased, as would, therefore, San Francisco's receipts under the Act.

In short, we cannot determine—indeed we have no idea—what effect any methodology for counting the homeless would have on the federal funding of any particular appellant recipient. Our review of the programs that apparently provide all federal funds received by appellant service providers (the EFS and CDBG programs) and of another program pointed to by appellants below (the Mentally Ill Individuals Act) indicates that a different count's effect on any one recipient depends both on the use to which census data are put in a given program, and on the count's effects on other recipients. The fact that, in most programs, the available funds are fixed means that if a more accurate count would have enlarged some communities' shares, it likely would have reduced the shares of other communities—including, possibly, Baltimore, San Francisco, and the other communities in which service providers are located. Even with a theoretically precise homeless count, then, appellants may have gained nothing.

To be sure, general allegations that federal funding will be reduced by the conduct of the census have been held sufficient to withstand motions to dismiss. *See, e.g., City of Detroit v. Franklin,* 4 F.3d 1367, 1374 (6th Cir.1993), *cert. denied,* 510 U.S. 1176, 114 S.Ct. 1217, 127 L.Ed.2d 563 (1994); *Tucker v. Department of Commerce,* 958 F.2d at 1415–16 (7th Cir.), *cert. denied,* 506 U.S. 953, 113 S.Ct. 407, 121 L.Ed.2d 332 (1992); *Carey v. Klutznick,* 637 F.2d 834, 838 (2d Cir.1980); *City of New York v. Dept. of Commerce,* 713 F.Supp. 48, 50–52 (E.D.N.Y.1989); *City of Willacoo-*

*chee v. Baldrige,* 556 F.Supp. 551, 554 (S.D.Ga.1983); *City of Camden v. Plotkin,* 466 F.Supp. 44, 47–51 (D.N.J.1978). *But see State of Texas v. Mosbacher,* 783 F.Supp. 308, 314 (S.D.Tex.1992) (since Texas failed to allege direct injury due to loss of federal funds, no standing). As we noted, however, "mere allegations"—which appear to be all any plaintiff offered in the above cases—are not an adequate response to a summary judgment motion, when "specific facts" are required. *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2136–37. Appellants have not met that test; they are unable to show that their injury, if any, was caused by the census count of the homeless.

### C.

■ Appellant voters claim that the census undercount of the homeless has diluted their vote because their "Representative represents a greater number of constituents than do other Representatives in the same assembly." *Federation for American Immigration Reform v. Klutznick,* 486 F.Supp. 564, 568 (D.D.C.) (three-judge court), *appeal dismissed,* 447 U.S. 916, 100 S.Ct. 3005, 65 L.Ed.2d 1109 (1980) *(FAIR).* They allege that they live in urban areas with disproportionately high homeless populations. Thus, when homeless people throughout their states were undercounted, more persons were missed in their areas than in less urban areas, and their representatives accordingly have more constituents than do representatives of rural areas with smaller per-capita homeless populations. The same logic applies to their interstate dilution claim: the disproportionately urban states in which they live have received too few representatives compared to less urban states.

Appellants may have established a vote dilution injury based on their contentions that their disproportionately homeless urban areas were undercounted. *But see FAIR,* 486 F.Supp. at 570 (no standing to challenge inclusion of illegal aliens in census because "[w]hile the plaintiffs estimate that between one and sixteen congressional seats will be affected depending on the inclusion of illegal aliens, they can do no more than speculate as to which states might gain and which might

lose representation"). Appellant voters' standing argument shares a flaw with those of appellant advocates and federal fund recipients, however: they have not demonstrated causation. As we have explained, we have not been shown that a better methodology was available, the selection of which would have benefitted them. But even more fundamental, we cannot derive from appellants' submissions any view as to whether an improved counting method would not only have increased the homeless count's accuracy, but would have relieved the dilution of their votes.

Indeed, it is quite likely that a better count would have made absolutely no difference. Assume, for example, the census counted 10,-000 persons in a hypothetical state with 10 districts, one of which is urban and one of which is rural. Further, assume the S–Night portion of the census missed 100 homeless persons in the urban district and 10 homeless persons in the rural district, and that these districts and the eight others in our hypothetical state were drawn based on the belief that they contained 1,000 persons.[5] The urban voter's vote is worth 1/1,100 while the rural voter's is worth 1/1,010, and the urban voter's vote is diluted relative to the rural voter by the difference between the two values (.0000810). A better methodology might have missed only 95 homeless persons in the urban district and only one in the rural district. But it would not have benefitted the urban voter. In fact, the urban voter's vote would have been more diluted relative to the rural voter's. The enumerated population of the state after use of the better methodology is 10,014, and presumably the districts would be redrawn on the basis of 1,001.4 person districts. If the district boundaries are altered only minimally to capture this extra person or so per district (so that the uncount-ed homeless persons remain in the same districts as our sample voters), the urban voter's vote is worth 1/1,096.4 and the rural voter's 1/1,002.4. The difference between the two values (.0000856) is larger—and the dilution relatively worse—under the more accurate count than it was under S–Night. The urban voter's vote is diluted—and he is injured in fact, see FAIR, 486 F.Supp. at 568—under either count. Since the urban voter is better off under S–night than under the more accurate count, however, S–Night is not the cause of the voter's dilution injury.

The record indicates that this hypothetical is not far-fetched. The S–Night methodology might have counted too few homeless persons in urban areas, but it counted no homeless persons in many non-urban areas (appellants contend that as many as 34,000 jurisdictions were not enumerated). Therefore, a homeless count that did a better job in San Francisco County as well as in Kern County, California (where homeless might have been counted for the first time) could have resulted in more accurate counts of both places, but no relative increase in the worth of a San Franciscan's vote.

Similarly, a more accurate count in New York as well as in Iowa might have resulted in larger population counts in both, but no relative change in voting population. And, such interstate vote dilution injury is difficult to establish.[6] As the Supreme Court has recently noted, "the Constitution makes it impossible to achieve population equality among interstate districts" since it "provides that '[t]he number of Representatives shall not exceed one for every 30,000 persons; each State shall have at least one Representative; and district boundaries may not cross state lines.'" *Wisconsin v. City of New*

---

5. This hypothetical assumes that representatives are apportioned within the state based on total population, rather than on qualified or registered voters. If apportionment were based only on the number of registered voters, see, e.g., *Garza v. County of Los Angeles*, 918 F.2d 763, 780–86 (9th Cir.1990), (concurring and dissenting in part), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991), an undercount of homeless might not result in any dilution if homeless persons are disproportionately not registered to vote. We do not know either way, but we note that while some of the individual appellants are described in the complaint as registered voters, none of the homeless appellants are.

6. Assuming an individual voter may assert it under the Constitution's provision that "Representatives be apportioned among the several states 'according to their respective Numbers.'" *Department of Commerce v. Montana*, 503 U.S. 442, 461, 112 S.Ct. 1415, 1427, 118 L.Ed.2d 87 (1992) (quoting U.S. CONST., art. I, § 2).

*York*, — U.S. ——, ——, 116 S.Ct. 1091, 1100, 134 L.Ed.2d 167 (1996) (quoting *Montana*, 503 U.S. at 447–48, 112 S.Ct. at 1419). It is thus no mean feat to discern the effect of a "better" homeless count on the vote of one state's residents *vis-a-vis* the residents of other states. Appellants do not try. In light of the uncertainties as to S–Night's effect compared with some other methodology, these "allegations are far too speculative to permit us to conclude that any particular [appellant] has an interest at stake in this proceeding." *FAIR*, 486 F.Supp. at 570–71.

\* \* \*

As no appellant has shown that the census has caused it injury that we can redress, we affirm the district court's grant of summary judgment.